R. J. REYNOLDS TOBACCO COMPANY,
Appellant,

v.

Elbert Berry HUDSON, Appellee.

No. 18315.

United States Court of Appeals
Fifth Circuit.

March 14, 1963.

Harry McCall, Jr., Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, La., for appellant.

H. Alva Brumfield, Baton Rouge, La., Melvin Belli, San Francisco, Cal., for appellee.

Before HUTCHESON, JONES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The plaintiff, Elbert Hudson, sued R. J. Reynolds Tobacco Company for $250,-000 damages, alleging that he had contracted cancer of the larynx and vocal cords "caused, precipitated, aggravated or contributed to" by the use of the defendant's tobacco products. Reynolds manufactures Prince Albert smoking tobacco and Camel cigarettes. The defendant filed a motion for summary judgment of dismissal on the ground that the undisputed facts showed that the action was barred by prescription of one

year under Articles 3536 and 3537 of the Louisiana Civil Code. The district court denied the motion for summary judgment, but issued the certificate necessary for an appeal under the Interlocutory Appeals Act, 28 U.S.C.A. § 1292(b). The defendant appeals from the order denying the motion.

The appeal presents serious questions of Louisiana law. If the contentions of the tobacco company are correct, the case should be dismissed and judgment granted to the defendant as a matter of law. "It is obvious that [such] a denial may settle a great deal." Federal Glass Co. v. Loshin, 2 Cir., 1954, 217 F.2d 936. In the circumstances, we consider that an appeal was properly taken. United States v. Woodbury, 9 Cir., 1959, 263 F.2d 784; In re Heddendorf, 1 Cir., 1959, 263 F.2d 887; Oskoian v. Canuel, 1 Cir., 1959, 264 F.2d 591; Wright, Interlocutory Appeals Act, 23 F.R.D. 199 (1959).

Without in any way passing on the merits, we hold that the district court correctly dismissed the defendant's motion for a summary judgment.

## I.

For purposes of this appeal, the following facts are admitted or established.

Almost every day from 1924 to 1957 Elbert Hudson smoked a tin of Prince Albert and two packages of Camel cigarettes. For at least two years before he brought suit, he had trouble breathing. August 23, 1957, Hudson had such acute respiratory distress that he was taken to a hospital in Bogalusa, Louisiana. He was unconscious and just able to breathe. The admission record shows that the provisional diagnosis was "neoplasm [cancer] of bronchus." He was transferred almost immediately to the New Orleans Charity Hospital. The Charity Hospital admission record contains the notations: "Think this is probably cancer of the larynx. High respiratory obstruction lesion. Indirect laryngoscopy reveals acute epiglossitis, acute laryngitis and fungating lesion of right vocal cord." Because of his difficulty in breathing, a surgeon at Charity Hospital performed an emergency tracheotomy. A laryngectomy biopsy revealed a large, fungating tumor of the larynx and epiglottis. September 5, 1957, a total laryngectomy was performed on Hudson. The tumor was a cancer of the larynx and vocal cords.

August 21, 1958, two days short of one year from the time Hudson first entered the hospital, he filed this action against Reynolds Tobacco Company.

In a deposition, Hudson stated that for years he had throat trouble, hoarseness, and difficulty in breathing, and that for two or three months before going to the hospital he had felt "something was wrong." But he said also that the first idea he had that smoking might be in any way connected with his trouble was when he was at Charity Hospital. He continued to smoke until the time of his operation. Dr. Charles E. Dunlap, in an affidavit the defendant submitted, affirmed:

"That it is his considered opinion, based upon a review of the records detailed hereinabove and his personal microscopic examination of the tissue removed from Hudson in the operation of 6 September 1957, that the cancer which was then removed was in existence and of such size and location for a very substantial period of time, and at least thirty days prior to the biopsy, i. e. microscopic examination, thereof at Charity Hospital in New Orleans on 23 August 1957, as to be readily observable and accessible to biopsy by a physician performing the examinations that would be clearly indicated in any patient with symptoms such as are detailed in Hudson's hospital histories and in his deposition."

Dr. Dunlap is Chairman of the Department of Pathology of the School of Medicine of Tulane University. The study of cancer has been one of his principal interests for many years. Dr. Alton

Ochsner, in an affidavit the plaintiff submitted, affirmed:

"It is of significance that on the x-ray request 23 August, Dr. Spence's diagnosis was asthma, there being no indication that he suspected a neoplasm in this request for an x-ray of the chest although it is probable that Hudson was suffering from a cancer of the larynx for many months and possibly for several years prior to admission to the Charity Hospital at which time an emergency tracheotomy and the diagnosis of cancer of the larynx was made. It would have been possible to have made the diagnosis previously. Such was not done and because of this it was impossible for Hudson to know what his diagnosis was until a definitive diagnosis was made at Charity Hospital, at which time the proper examinations were made.

"Because of the definite cancer producing effect of cigarette smoking, it is my firm conviction that Hudson's cancer of the larynx was caused by his excessive smoking and that because he continued smoking up to the time of his operation, at which time a total laryngectomy was done on 5 September 1957, the condition was aggravated and continued to be aggravated as long as he continued to smoke."

Dr. Ochsner is Professor of Surgery at Tulane and Director of Surgery at the Ochsner Clinic and Ochsner Foundation Hospital. The study of cancer, particularly its relation to smoking, has been one of his principal interests for many years.

## II.

■ The applicable prescription is the one year period for offenses (torts) provided in Articles 3536 and 3537 of the Louisiana Civil Code. In pertinent part, Article 3536 of the Louisiana Civil Code reads:

"3536. The following actions are also prescribed by one year: That for injurious words, whether verbal or written, and that for damages caused by animals, or resulting from offenses or quasi-offenses. * * *"

Article 3537 reads:

"The prescription mentioned in the preceding article runs:

"With respect to the merchandise injured or not delivered, from the day of the arrival of the vessel, or that on which she ought to have arrived.

"And in the other cases from that on which the injurious words, disturbance or damage was sustained.

"And where land, timber or property has been injured, cut, damaged or destroyed from the date knowledge of such damage is received by the owner thereof."

The tobacco company argues:

A. The affidavits of Drs. Dunlap and Ochsner establish that the cancer came into existence more than a year before the suit was filed, and therefore no more evidence is needed to show that the cause, if any, prescribed.

B. If the plaintiff's knowledge is relevant, his deposition shows that he had actual knowledge of his condition for more than a year before filing suit, but in any event, on the undisputed facts and under the law of Louisiana, he must be held to have had constructive knowledge of his damages for at least that time.

This argument overlooks the nature of the plaintiff's claim. Cancer comes like a thief in the night. Assuming, as we must for purposes of this appeal, a nexus between cancer and smoking, no one can say when Hudson's cancer first came into existence. Only by a trial on the facts can it be determined when Hudson knew or should have known that he might have an actionable injury he could attribute to smoking.

Article 3537 does not speak in terms of the "existence" of an injury or "occurrence" of the act causing the injury. Prescription runs from the day "damage was sustained." This language shows

an intention to eliminate, as the commencement date for prescription, the date of the act causing the injury when that date does not coincide with the day the damage was sustained. Here, of course, the damage results not from a single, identifiable act causing traumatic injury but from a slow development of a hidden disease over the years. Can it be said that the damages were sustained when the first cell division assumed an abnormal pattern, beginning what might be considered a continuing offense? Or is the crucial date a later point in a chain of continuous damage, beginning with some physical manifestation? For example, was it when Hudson suffered his first hoarseness? Or when he had his larynx removed? The interplay of objective manifestation of the disease and subjective knowledge by the plaintiff makes it impossible in this case to fix the date of the commencement of prescription as a matter of law.

■■■ The Code's focus on the day damages were *sustained* rather than on the day of the act causing the damage is in itself an amelioration of the harshness of a one year prescriptive period. The plaintiff's burden is further lightened by judicial construction that prescription runs from the time a plaintiff knows or should know he has sustained damages. We believe, and so hold, in the factual situation this case presents, that a logical and necessary extension of that principle requires the plaintiff to have had knowledge of the relationship between the offense and damages sustained in order for knowledge to start the running of prescription under Article 3537.

There is no case in Louisiana directly in point and the general jurisprudence in Louisiana on commencement of prescription furnishes uncertain guidelines.

The plaintiff characterizes the alleged offense as a continuing tort, relying on loose language in some of the cases to the effect that a continuing tort will suspend prescription. Devoke v. Yazoo & M.V.R. Co., 1947, 211 La. 729, 30 So.2d 816; DiCarlo v. Laundry and Dry Cleaning Service, 1933, 178 La. 676, 152 So. 327; Werges v. St. Louis C. & N. O. Ry. Co., 1833, 35 La.Ann. 641. But in these cases the defendant's conduct amounted to a continuing *nuisance* and the action was primarily one for an injunction. More accurately, these are not cases of continuing tort but of continuing damage. De Lizardi v. New Orleans Canal and Banking Co., 1873, 25 La.Ann. 414, although not a nuisance case, demonstrates the difference. There the plaintiff sued for damages resulting from an illegal attachment of his plantation by the defendant during a period of seven years. The plaintiff sought to avoid the one year prescription on the theory that there could be no prescription until the end of the wrongful act, at which time the amount of damages would be known. The court sustained the plea of prescription:

> "We concede that there is good reason why the law regulating prescription in such cases ought to be as the counsel contends that it is. But we have no right to alter the positive provision of the Code, which declares that prescription runs from the day on which the *injury* or *damage* was sustained. C. C. [3537] 3637. And that is what is maintained in the case of Mestier, quoted by plaintiff, as we understand that case. "We think *the prescription of one year should be maintained against the portions of the demand of the plaintiff, which arose one year before the institution of this suit.*" (Emphasis supplied.)

Griffin v. Drainage Commission, 1903, 110 La. 840, 34 So. 799, was an action for damages to the plaintiff's building caused by the construction of a canal. The Louisiana Supreme Court, although using the language of a "continuing tort", held that prescription ran from the time of the damage and was not suspended by the continuous nature of the defendant's action:

> "Assuming, for the purposes of this case, that defendant was in fact and in law responsible for the damage to plaintiff's building, he does not show

what part of that damage was sustained after the period fixed for prescription. Where a wrongful act gives rise to immediate damage, the law directs that an action for redress must be brought within a year of that date.

"That date is to be taken as the initial point for the one year's prescription. If an action is brought at a period later than a year from that date, the plaintiff must allege and show the state of facts which justified him in his postponement in bringing the action."

In Delta Theatres, Inc. v. Paramount Pictures, D.C.E.D.La., 1958, 158 F.Supp. 644, the plaintiff sought to recover damages allegedly sustained as a result of a conspiracy which had existed for some years prior to the filing of the action. The court recognized the continuing nature of the tort but held:

" * * * In the case of successive damages suffered day by day from a continuing conspiracy, the statute begins to run on each day's damage as it occurs. When suit is brought, the plaintiff may recover only for damages inflicted during the period of limitation immediately preceding the filing of the complaint. In the present case, therefore, Article 3536 of the Louisiana Civil Code will bar recovery for all damages suffered more than one year prior to the filing of this complaint on January 8, 1953."

See also Streiffer v. Seafarers Sea Chest Corporation, D.C.E.D.La., 1958, 162 F. Supp. 602.

■ In short, if the alleged offense here is a continuing tort, it still will not toll the statute. Continuing damage, however, will toll the statute—in the sense that damage sustained within the year before suit was filed is recoverable, if it can be identified as having been sustained within the year as distinguished from damage sustained before that year. That presents a jury question.

Reynolds relies, in part, on two decisions of this Court for a literalistic construction of Article 3537. In McCaleb v. Fox Film Corporation, 5 Cir., 1924, 299 F. 48, applying the *eiusden generis* canon, the court held that the exception in the last paragraph of the article, allowing prescription to start from "knowledge of damage", was limited to claims for damages to such "property", as "land" and "timber." That was an action for infringement of a copyright, however, and the Court pitched its decision on "the intangible interest which a copyright confers." In McLaughlin v. Western Union Telegraph Co., 5 Cir., 1927, 17 F. 2d 574, the plaintiff sued March 2, 1925, to recover damages for personal injuries resulting from an accident that occurred June 1, 1922. The plaintiff contended that the statute was tolled because he did not know the extent of his injuries until less than a year before he sued. The court held that "[o]n the facts shown by the record * * * plaintiff's cause of action arose coincident with the accident." That is the typical situation in personal injury actions based on a single act, when the severity of the trauma is, or should be, apparent. It would be an absurdity, as the court said, to follow the plaintiff's theory, for "a person might suffer a trifling injury in his youth, and live to a ripe old age before bringing suit." The ratio decidendi of the decision, however, is that the complaint "clearly alleges serious permanent injury dating from the day of the accident"; the employee "knew the facts of his injury, and that it was serious and actionable"; and, "[i]t is only when one does not know that he has suffered an actionable injury that the statute is tolled."

The significant point in McLaughlin, as we see it, is that Judge Foster, organ of the Court, did not distinguish between property damage and personal injury; he expressly stated that "Louisiana recognizes the doctrine contended for by plaintiff." On balance, the case lends little support to Reynolds, for the net holding is: mere ignorance of the extent of damages suffered from traumatic in-

jury will not toll the statute, but the statute is tolled "when one does not know that he has suffered an actionable injury." Cf. American Tobacco Co. v. People's Tobacco Co., 5 Cir., 1913, 204 F. 58.

The Louisiana courts have not taken a narrow view of Article 3537. In Guderian v. Sterling Sugar & Ry. Co., 1922, 151 La. 59, 91 So. 546, involving a claim under the Employers' Liability Act, the Louisiana Supreme Court held squarely that the exception recognizing prescription as starting with knowledge of damage applies in a personal injury action. The court said:

"'A person cannot bring suit until his cause of action has accrued, and until a cause of action has accrued, prescription cannot run against it. Jones v. T. & P. R. R. Co., 125 La. 542, 51 South. 582, 136 Am.St.Rep. 339.'

"While the above was said in relation to another [that is, for property damage], though a kindred prescription, yet the fundamental principle involved is equally as applicable here as it was there. To the same effect as the South Arkansas Lumber Co. case is the case of Rady v. Fire Insurance Patrol, 126 La. 273, 52 South. 491, 139 Am.St.Rep. 511. The cases of Griffen v. Drainage Commission, 110 La. 841, 34 South. 799, and Egan v. Hotel Grunewald, 134 La. 740, 64 South. 698, cited by defendant, do not lead to a different conclusion. They state the rule where a single act causes continuing and progressive damage. Even those cases recognize an exception to the rule they announce, for it is there stated, in effect, that prescription is suspended if it be made to appear that there was good legal reason for not bringing the action earlier, and therefore, if anything, they support the view taken in this opinion."

In that case, as in the case at bar, the cause of action ripened with time. On January 9, 1919, one of the defendant's employees struck the plaintiff over the eye. The blow caused a gash which required some slight medical attention but gave the plaintiff no concern and did not cause him to lose a day's work. Early in April he observed spots before his eyes. April 23 he noticed that his eyesight was failing. The evidence showed that the blow over the left eye caused the retina to be detached in the right eye. In May he lost his left eye and became totally blind. He filed suit April 22, 1920. The defendant contended that prescription began to run from the time the blow was struck; the plaintiff contended that it commenced at the time he lost his eye. The Court held:

"Undoubtedly, the blow injured the optic nerve at the time it was given, but plaintiff did not know that, and had no means of ascertaining it. His eyesight was not perceptibly affected. He continued his work, stopping only long enough to have the wound on the forehead dressed. He had no cause of action at that time under the Employers' Liability Act. His cause of action was in process of development, but without knowledge of this fact on his part, or means of knowledge. The first symptom that arose suggesting the possibility that his eye was injured was not sufficient to excite the slightest alarm in his physician, whose opinion dissipated plaintiff's fears. He had no knowledge of even what might happen until April 23, 1919, which was within one year prior to this suit, unless the symptom, above mentioned be deemed knowledge, but we think it should not.

"Plaintiff's cause of action did not arise until he lost his eye. It is self-evident that one cannot sue until his cause of action arises." Guderian v. Sterling Sugar & Ry. Co., 1922, 151 La. 59, 91 So. 546, 547.

■ In its analysis of the problem the Court referred with approval to the principle that prescription is suspended "if it be made to appear that there [is] good legal cause for not bringing the action

earlier." In spite of this reference to *suspension* of prescription, the rationale of the decision is that the cause of action does not *accrue* under the Employers' Liability Law until the plaintiff has knowledge of the relation between the offense and the injury (loss of an eye) which is the subject of the suit. Knowledge of the date of the occurrence of the offense, knowledge of some injury resulting from the act causing the damage, and the objective manifestation of the injury are not enough. Applying this rationale here, Hudson's cause of action did not accrue until Hudson knew or should have known that his acute respiratory distress and diseased larynx were caused by smoking.

In evaluating Guderian it is necessary to temper the Court's language by the realization that the case was filed under the Louisiana Employers' Liability Act. Compensation could not be fixed until the *result* of the compensable injury was known; Guderian could not sue for loss of an eye until he had lost an eye. In Salvaggio v. I. C. R. Co., 151 La. 66, 91 So. 549, the Louisiana Supreme Court pointed out:

> "We are not unmindful of the fact that we held in the case of A. Guderian v. Sterling Sugar & Railway Co. (No. 24544) 91 South. 546, this day decided, that the limitation of time within which an action must be brought for compensation under the Employers' Liability Act begins to run from the date of the effect resulting from the injury, and not from the date of the injury."

Similarly, in McLaughlin v. Western Union, 5 Cir., 1927, 17 F.2d 574, 576, this Court distinguished Guderian on the ground that the Louisiana Supreme Court "held that at the time plaintiff received the blow he had no cause of action under the Workmen's Compensation Law and that it did not arise until he lost the use of his eye." See also Manuel v. Travelers Ins. Co., La.App., 1950, 46 So. 2d 319, 320.

Perrin v. Rodriguez, La.App., 1934, 153 So. 555, is blackletter authority that pain and suffering and the physical manifestation of injury may not be sufficient to start prescription running, if the plaintiff has good cause for not having knowledge of the connection between the offense and the damages sustained. In that action the plaintiff sued a dentist for damages allegedly caused by the negligent removal of ten teeth, parts of the roots of which were left in the jawbone sockets. The extraction took place in June 1929. For about fourteen months the plaintiff complained of pain and at intervals the defendant attempted to alleviate the pain. The plaintiff was not aware that roots were still embedded in his jawbone and were the cause of the pain until he consulted another dentist, August 23, 1930. The plaintiff sued May 12, 1931, nearly two years after the extraction. Judge Janvier, speaking for the Court, held:

> "*Under such circumstances the prescriptive period did not commence to run until plaintiff discovered that he had sustained injury and that it had resulted from the negligence of defendant.* So long as he continued to rely upon the professional advice of defendant, and so long as defendant continued to assure him that the pain was being caused by the denture or false teeth, there was no obligation on his part to commence his suit for redress. *He could not sue because he did not know that he had sustained the injury as the result of the negligence of defendant.* During that period the course of prescription was suspended. A defendant who either intentionally or unknowingly 'succeeds in concealing from a creditor his cause of action cannot be allowed to reap the benefit of his own wrong'." (Emphasis supplied.)

The Court pointed out:

> "The doctrine that the prescriptive period does not commence until the injured party discovers that he has been damaged is peculiarly applicable to a case such as this where

there is such relationship as must exist between a doctor and his patient. It would not do to permit a doctor, who may discover that he has made a mistake which has caused damage to a patient, to continue to treat the patient, concealing the true condition until the accrual of prescription and to then interpose the plea that the action, based on the mistake, comes too late. Whether the doctor discovers the mistake and intentionally conceals it or negligently fails to discover it, is not important, the important fact being that, through reliance on the doctor's skill and ability, the patient has not discovered that the injury which he has sustained resulted from fault of the doctor.

"Here, it does not appear that the concealment was intentionally resorted to, but the result which would be possible should such a plea be sustained shows clearly the fallacy of the reasoning of counsel who seeks to sustain it."

■ The plaintiff's argument in Perrin v. Rodriguez is similar to the plaintiff's argument here. First, Perrin contended that he had no knowledge of the fact that he had an actionable injury. Second, Perrin contended that in reliance on the doctor's skill and ability he was lulled into a false belief; the dentist, taking advantage of such reliance, concealed the fact that all the roots had not been extracted. The second argument is an appeal to the doctrine of *contra non valentem*, discussed in section III of this opinion. These are two distinct exceptions to Article 3537. As the Court said:

"Usually the prescription which, after the lapse of one year, bars a claim for damage ex delicto, runs from the day on which the damage was sustained—Civil Code, Art. 3537 —*but there is an exception where there was no knowledge of the fact that there was damage or where, through some act of the party who*

*caused the damage, the injured person is kept in ignorance of the fact that there [had] been damage or of the cause thereof."* (Emphasis supplied.)

In Aegis Ins. Co. v. Delta Fire and Casualty Co., La.App., 1957, 99 So.2d 767, the Court of Appeals considered that "[t]he Perrin case when read as a whole [stands only for] the principle of 'contre non' "; the doctor-patient relationship and the dentist's deceit were essential to the holding. This view of Perrin seems unnecessarily restrictive, but even if it is accepted, so the plaintiff argues, there is a parallel between Hudson's reliance on Reynolds' advertising assurances and Perrin's faith in his dentist.

Going now to the property cases, we find that it is settled in Louisiana that constructive knowledge is sufficient to commence the running of prescription. This Court stated the rule in Iberville Land Co. v. Amerada Petroleum Corporation, 5 Cir., 1944, 141 F.2d 384:

"Article 3537 of the Civil Code of Louisiana provides that prescription runs from knowledge of the offense or quasi-offense, and it is settled law that the knowledge spoken of in said Article is not necessarily actual knowledge, but notice sufficient to excite attention and put a person on his guard and call for inquiry."

See also Cox v. DeSoto Crude Oil Purchasing Corp., D.C.W.D.La., 55 F.Supp. 467; Young v. International Paper Co., 1934, 179 La. 803, 155 So. 231; Luke v. Caddo, 1929, 11 La.App. 657, 124 So. 625.

The closest non-Louisiana case in point is Mitchell v. American Tobacco, D.C. M.D.Pa., 1960, 183 F.Supp. 406. In that case the complaint alleged that Mitchell died, February 1958, as a result of lung cancer allegedly caused by smoking. He smoked two packages of cigarettes a day for many years. The defendant pleaded the Pennsylvania Statute of Limitations of two years. The Court quoted approvingly from Ayers v. Mor-

gan, 1959, 397 Pa. 282, 154 A.2d 788, 792:

> "Both the defendant and the lower Court have apparently misevaluated the specific wording of the Act of June 24, 1895. It seems they regard the crucial words as reading: 'Every suit * * * must be brought within two years from the time *the act was committed.*' The statute, however, says that the suit must be 'brought within two years from the time *when the injury was done.*' The injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable."

And held:

> "That, it seems to me, is the only sound, logical and humane conclusion that can be reached in this case, and it seems to be the trend both in Federal and State courts. To paraphrase the court in Ayers, whether plaintiff's averment that the lung cancer did not become apparent until it was discovered at a time well within the two year period can be supported by evidence, only the trial itself can determine, but the plaintiff is certainly entitled by law to have the opportunity to present his evidence, and by the same token defendant would then be entitled to introduce evidence as to any negligence on the part of plaintiff's decedent."

The holding in Mitchell is in line with Urie v. Thompson, 1949, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282, an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. In Urie the Court held that an employee who had silicosis was "injured" when the "accumulated effects of the deleterious substance manifest themselves"; that, on the record, there was "no suggestion that Urie should have known he had silicosis" prior to the diagnosis of the disease. The legislation would afford Urie "only a de-lusive remedy", if the remedy were barred because "at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs." See also Quinton v. United States, 5 Cir., 1962, 304 F.2d 234, another FELA case. That was a tort action for malpractice. The plaintiff's pregnant wife was given three transfusions of RH positive blood, when her correct blood type was RH negative. Judge Tuttle, for this Court, ruled: "[B]y far the most sensible and just rule * * * is that a claim for malpractice accrues against the Government when the claimant discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." And see United States v. Reid, 5 Cir., 1958, 251 F.2d 691; Kozan v. Comstock, 5 Cir., 270 F.2d 839.

Similar reasoning supports the clearly discernible trend in products liability cases in the direction of holding that when a product can cause a disease which does not manifest itself immediately, the "plaintiff's cause of action should not accrue until his disease was diagnosed or until he should have discovered the nature of the disease." 2 Frumer and Friedman, Products Liability (1961) § 39.01 [3]. See Sylvania Electric Products Co. v. Barker, 1 Cir., 1955, 228 F.2d 842; Wright v. Carter Products, 2 Cir., 1957, 244 F.2d 53; Ricciuti v. Voltarc Tubes, 2 Cir., 1960, 277 F.2d 809; Note 12 A.L.R.2d 277.

If we should accept the tobacco company's first proposition, that, regardless of Hudson's lack of knowledge, mere proof of "existence" of the cancer for more than a year before Hudson filed suit was enough to show the action was barred, it would mean that the claim prescribed before Hudson knew he had a claim. This would be an intolerable application of Article 2315 giving to every injured person a remedy.[1] If we should

---

1. There are two great fundamentals in the Louisiana Code, Article 2315 and Article 21. Article 2315 provides:

"Every act whatever of man that causes damage to another, obliges him by whose act it happened to repair it." Article

786

accept the defendant's alternative proposition, that constructive knowledge of his damages may be imputed to Hudson based only on his awareness of his respiratory troubles, it would mean that, unless he had reason to know or to believe that smoking caused cancer, his claim would have prescribed before he could know enough about it to sue.

Pulling all of the loose threads together, as well as we can, we hold that prescription commenced to run from the time the disease manifested itself to the point when Hudson knew, or should have known, that the damages he sustained, which were the subject of his suit, resulted from smoking the defendant's tobacco products. When this took place is a jury question. We believe that this holding is more consistent with the language and spirit of the Code, the Louisiana cases (such as they are), analogous decisions from other jurisdictions, and with good sense than the more limited view the defendant takes of Article 3537.

### III.

#### *Contra Non Valentem*

The plaintiff contends that Hudson's lack of knowledge of his actionable damages was caused by the defendant's misconduct and, therefore, under the doctrine of *contra non valentem*, the statute was tolled.

The doctrine of *contra non valentem agere non currit praescripto* (No prescription runs against a person un-

able to bring an action.) is deeply embedded in the civil law and, notwithstanding Article 3521,[2] in Louisiana jurisprudence.[3] See Favrot, Comment, Scope of the Maxim Contra Non Valentem in Louisiana, 12 Tul.L.Rev. 244 (1938); the concurring opinion of Justice Monroe in Hyman v. Hibernia Bank & Trust Co., 1916, 139 La. 411, 71 So. 598; and the thorough review of the Louisiana decisions in Aegis Insurance Co. v. Delta Fire & Casualty Co., La.App., 1958, 99 So.2d 767, 787. As early as 1817 and 1822 the Supreme Court held that the doctrine was not inconsistent with the positive law of the State. Quierry's Executors v. Faussier's Executor, 1817, La. S.Ct., 4 Mart. O. S. 609. See also Morgan v. Robinson, 1822, La.S.Ct., 12 Mart. O.S. 77, 13 Am.Dec. 366.

The doctrine is a principle of equity and natural justice, applicable in Louisiana when there is an impossibility to interrupt prescription by suit or when the inability of the injured person to sue is caused by the offending person's misconduct, fraud or concealment. "The doctrine of 'contra non' is therefore used as an equitable estoppel *in those cases in which the facts justify its application.*" Aegis v. Delta, supra. Thus, in Kennard v. Yazoo & M. V. R. Co., La.App., 1939, 190 So. 188, 191, the court said:

"[I]t has been adopted and applied in a somewhat limited and restricted sense in this State. The rule is a child of necessity brought into being to prevent the injustice of an innocent plaintiff being lulled into a

---

21 has a force all its own. It reads: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent." The "equity" and "natural law" of Article 21 are not referred to within the context of Anglo-American law. Article 21 is based directly on lex 11 of the French draft code of the year VIII (replaced by another text) and is close to Article 1 of the Swiss Code. Franklin,

Article 21, 9 Tul.L.Rev. 485 (1935). See also Judge Monroe's concurring opinion in Hyman v. Hibernia Bank, 1916, 139 La. 411, 71 So. 598.

2. Article 3521 provides: "Prescription runs against all persons, unless they are included in some exception established by law."

3. Justice Ott, in Kennard v. Yazoo M. V. R. Co., La.App., 190 So. 188, 191, to the contrary notwithstanding.

course of inaction in the enforcement of his right by reason of some concealment or fraudulent conduct on the part of the defendant, or because of his failure to perform some legal duty whereby plaintiff has been kept in ignorance of his rights."

But in that case the court refused to apply the maxim, observing:

" * * * it does not appear in what way plaintiff was misled or deceived as to any of his rights, nor does it appear that anything was put in the way of his asserting those rights during the prescriptive period. Defendant did nothing in the way of active machination to cause plaintiff to postpone filing his suit to enforce his claim before prescription accrued. * * * "

See also Maxfield v. Gulf States Utilities Co., La.App., 1953, 65 So.2d 615. "Neither ignorance of rights nor nonresidence would avail to defeat prescription, nor would mere passivity of the debtor, but there must be activity or machinations of the debtor lulling his creditor into a false security." Colley v. Canal Bank & Trust Co., 5 Cir., 1947, 159 F.2d 153.

 That mere ignorance is not sufficient to allow a plaintiff to invoke the doctrine of *contra non* is clear from the court's discussion of Perrin v. Rodriguez in Aegis Ins. Co. v. Delta Fire & Casualty Co., La.App., 1957, 99 So.2d 767.[4]

Paragraph 8 of the complaint bears on prescription as well as liability. It alleges:

"That the defendant was wantonly and grossly negligent and its actions were reckless, careless and with total disregard to the health of the public and particularly this complainant, in selling, advertising and distributing its tobacco and cigarettes without warning; that the defendant was wantonly and grossly negligent and its actions were reckless, careless, and with total disregard to the health of the public and particularly this complainant in giving assurances of safety in the selling, advertising and distributing of its tobacco and cigarettes; that the defendant was wantonly and grossly negligent and its actions were reckless, careless and with total disregard to the health of the public and particularly this complainant in the manufacturing, processing, mixing and using the ingredients and tobaccos which complainant smoked; that the defendant warranted that its products were wholesome, when in truth and fact they were not."

 We express no opinion, of course, as to the merits of this allegation. But, for purposes of the plea of prescription, paragraph 8 must be read as alleging that the defendant's misconduct, failure to warn, and advertising that its products were wholesome, were

---

4. At 99 So.2d 783, the Court said:
" * * * [Perrin], rather than holding that mere ignorance suspends prescription is in accord with the doctrine of 'contra non' as expressed in the cases previously cited, for the basis of the holding in this case is actually that because of the close relationship that must exist between a doctor and his patient, the plaintiff through reliance on the doctor's skill and ability has been lulled into a false belief.

"Counsel for plaintiff contends that the case at bar fits both of the exceptions commented upon by the court above quoted to the effect that where there was no knowledge of the fact that there was damage or where through some act of the party who caused the damage the party is kept in ignorance of the fact that there has been damage he argues that the mere fact that plaintiff had no knowledge of the fact that there was damage until June 1956 suspended prescription. In the Perrin case, supra, the reason there was no knowledge of the fact that there was damage on the part of the plaintiff was due to the concealment of that fact either intentionally or otherwise by the defendant, and the ignorance of the plaintiff in the Perrin case was due to the concealment of the fact that the roots had not been pulled by the defendant dentist."

responsible for the plaintiff's not bringing a timely action. See Judge Goodrich's concurring opinion in Pritchard v. Liggett Myers Tobacco Co., 3 Cir., 1961, 295 F.2d 292; Cooper v. R. J. Reynolds Tobacco Co., 1 Cir., 1956, 234 F.2d 170.[5]

Paragraph 8 raises disputed questions of fact as to Reynolds' alleged misconduct and whether Hudson's failure to sue was indeed caused by his reliance on such alleged misconduct. These unresolved issues of material fact make it improper for the Court to dismiss the case on motion for summary judgment.

## IV.

### Summary Judgment

█ The "mission of the summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." [6] Salutary as this procedural device of summary judgment is, it has had a checkered career in this circuit. A recent study notes that of more than 150 cases in the Fifth Circuit of summary judgment, about one-half have resulted in reversals. Pyle, Appraisal of Summary Judgment Practice, 31 Miss.L.Jour. 147 (1961).

This Court has said, in Palmer v. Chamberlin, 5 Cir., 1951, 191 F.2d 532, 540, 27 A.L.R.2d 416:

"[B]efore rendering judgment the Court must be satisfied not only that there is no issue as to any material fact, but also that the moving party is entitled to a judgment as a matter of law. Where, as in this case, the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judg-

ment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law."

In Demandre v. Liberty Mutual Insurance Company, 5 Cir., 1959, 264 F.2d 70, 72, going about as far as the Rules permit, we stated:

" * * * whether the 'facts' stated in the complaint present a 'genuine issue as to any material fact' as F.R.Civ.P. 56 requires is really to be measured by whether no evidence could be offered to support the plaintiff's theory."

See also Alabama Great So. R. Co. v. Louisville & Nashville R. Co., 5 Cir., 1955, 224 F.2d 1, 50 A.L.R.2d 1302; Chapman v. Hawthorne Flying Service, 5 Cir., 1961, 287 F.2d 539; Shahid v. Gulf Power Co., 5 Cir., 1961, 291 F.2d 422.

█ This interlocutory appeal deals only with prescription; we are not concerned with the merits of the case. Here, the plea of prescription raises legal issues the applicability of which depend on the facts. Only by developing the facts in a trial of the case can it be determined whether there is truly no genuine issue as to any material fact entitling the defendant to a judgment as a matter of law on its plea of prescription. In reaching this conclusion, we do not mean to say and we do not imply that on the state of the record before us the plaintiff's proof warrants submission of the case to the jury on the factual issues forming the basis for his opposition to the plea of prescription.

The judgment is Affirmed.

---

5. In context, it must be pointed out, these relate to the liability for breach of warranty or for negligent misrepresentation —not to tolling the statute of limitations.

6. Report of the Proposed Amendments to Certain Rules of Civil Procedure for the United States District Courts, submitted by the Judicial Conference of the United States, September, 1962.