520 F.2d 1019
 Albert L. NIVENS, Plaintiff-Appellee,
v.
SIGNAL OIL & GAS CO., INC., Defendant Third-Party Plaintiff-Appellant,
LOUISIANA OFFSHORE CATERERS, INC., Third-Party Defendant-Appellee,
Travelers Insurance Company, Intervenor-Appellant.
 No. 74-2206.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 8, 1975.
 
 Geoffrey H. Longenecker, William A. Porteous, III, James J. Morse, Jr., New Orleans, La., for defendant third-party plaintiff-appellant.
 Donald V. Organ, New Orleans, La., for Alfred Nivens.
 Fred E. Salley, Edward J. Koehl, Jr., Donald L. King, New Orleans, La., for La. Offshore Caterers.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GODBOLD, Circuit Judge, SKELTON, Associate Judge,* and GEE, Circuit Judge.
 GODBOLD, Circuit Judge:
 
 
 1
 On July 10, 1971, appellee Albert Nivens was working as a cook aboard the stationary platform of appellant Signal Oil & Gas Company on the continental shelf in the Gulf of Mexico. He was employed by third party-appellee Louisiana Offshore Caterers, Inc. Cabinet doors located in the galley above where Nivens was working were defective and would come open without warning. While Nivens was carrying out his duties he struck his head on the bottom corner of one of those doors which had come open. More than a year later, September 22, 1972, he filed suit against Signal for injuries allegedly resulting from this occurrence.
 
 
 2
 At trial the evidence showed that immediately upon impact it was revealed that Nivens had suffered injuries that appeared to be relatively minor in nature. Also, beginning a few days later and continuing for more than a year, he suffered manifestations of an abnormal condition that he did not consider to be related to the accident and that were not diagnosed by doctors as traumatic in origin but after the expiration of a year were found to be symptomatic of substantial injury.
 
 
 3
 The principal question raised on appeal is whether as a matter of law plaintiff's action was prescribed under Louisiana law, LSA-C.C. Art. 3537, which provides that the one year statute of limitations for tort actions begins running when the "damage (was) sustained."[1] The court submitted to the jury Signal's defense of prescription, by this special interrogatory:
 
 
 4
 Did the plaintiff bring this suit within one year of the date he knew or, by the exercise of reasonable care, should have known that he had sustained damages resulting from the alleged accident?
 
 
 5
 to which the jury answered "Yes." The jury found for Nivens on the merits, and awarded $175,000 in damages.[2] We conclude that as a matter of law Nivens' claim had prescribed, and the case is reversed.
 
 
 6
 The cabinet door struck Nivens between his eyes and above the bridge of the nose. Vidrine, his assistant, standing about two feet away, described the noise of the contact as loud and stated that Nivens hit himself "real hard" on the cabinet. Nivens variously described the impact as a "hard lick," a "bump," and as no more significant than mashing a finger. Nivens stepped or fell backwards and was caught by Vidrine. Long afterwards Nivens told one of his doctors that he was "momentarily dazed." He displayed anger over the occurrence and complained generally to his co-workers of the incident and of the pain it caused him. Vidrine described these complaints this way: "He said how his head hurt and how he hit it hard; how much it hurts."
 
 
 7
 Slight swelling and a red spot appeared at the point of impact immediately, although the skin was not broken. Nivens experienced immediate pain and headache which continued for three to four hours. Signal's superintendent on the job testified with respect to a time soon after the accident:
 
 
 8
 A. I was in the bunkhouse and Mr. Nivens came in the bunkhouse and he was very upset and he was holding his head and I asked what had happened. He walked on back to his bunkroom and sat down.
 
 
 9
 Q. He said what?
 
 
 10
 A. He just said he bumped his head at that time.
 
 
 11
 Q. Did he say what he bumped his head on or not?
 
 
 12
 A. Cabinet door.
 
 
 13
 Q. And what was he doing with his hand, if anything?
 
 
 14
 A. He was holding his forehead, rubbing his head.
 
 
 15
 The foregoing are the immediate consequences. Less immediately but at a time not specifically identified Nivens began complaining to Vidrine about "bad headaches," stating that his head "hurt a lot." Vidrine noticed a change in Nivens' demeanor. Contrary to his usual manner Nivens had no patience with the men he was feeding or with his co-workers. The superintendent described another occasion, not fixed as to time, when Nivens came into the bunkhouse and laid down with his hand over his head. The superintendent inquired what was the matter and Nivens complained of feeling unwell and dizzy.
 
 
 16
 Meanwhile, commencing within two days to a week after the accident, Nivens became subject to frequent, and at times heavy, drainage of clear fluid from his nose. The drainage was heaviest at night. Vidrine observed that Nivens' pillow was wet from the drainage. Vidrine's opinion was that the headaches and the heavy drainage evidenced by the wetting of the pillow were serious, and he advised Nivens to see a doctor.
 
 
 17
 Nivens described his general reaction this way:
 
 
 18
 The blow to my forehead caused a bump. It did not break the skin. It was painful but it did not cause me to loose (sic) any time from work or seek medical attention. I did not believe at that time that I received any serious injury from that blow.
 
 
 19
 At the time of the incident and for three months preceding Nivens had been under the care of Dr. Hagen for an inner ear disorder, one of the consequences of which was drainage of a yellowish discharge from one ear. Nivens complained to Dr. Hagen of the nasal drainage and even displayed to him a stained pillowcase evidencing its volume. In August Dr. Hagen referred Nivens to an allergy specialist who noted a prior history of prolonged and severe disease of the inner ear and with respect to the nasal drainage made a tentative diagnosis of allergy. This was not, however, substantiated by tests, and he began treatment directed at the inner ear condition. Nivens became dissatisfied and terminated this relationship in November but continued under the care of Dr. Hagen.
 
 
 20
 The slight swelling in the forehead remained, and during the year after the accident it became firm or "gristly" to the touch. A doctor who observed it slightly more than a year after the injury described it as "a firm small swelling in the middle of the forehead, approximately 1 cm. in diameter." It was still there at the time of trial.
 
 
 21
 In early June 1972 Dr. Hagen referred Nivens to another allergist. Nivens told this doctor that he considered his condition allergic. Tests, followed by a second test to be "double sure," were negative. Around June 12 the allergist told Nivens in positive and emphatic terms that he had no allergy and that he should dismiss allergy from his mind.[3]
 
 
 22
 Finally, in late June or early July 1972, Nivens was referred to a group of nose specialists who in turn called in a neurosurgeon. Nivens was hospitalized in July to try to determine the etiology of the nasal discharge. Concerned that the place on his forehead and two other skin blemishes on his body might be malignant, Nivens mentioned them to the surgeon. When asked the source of the thickened skin he related the incident concerning the cabinet door. A prompt medical test quickly revealed that the fluid discharging through the nasal passages was spinal fluid draining into the nasal cavity through a hairline fracture in the base of the skull, 3/8 to 1/2 inch long. This diagnosis was made on or about July 18, and in any event after more than a year had elapsed. There is no substantial evidence suggesting that the fracture originated from a cause other than the impact with the door.
 
 
 23
 Surgery was performed July 31, primarily to cut off the route by which the fluid was draining because its presence threatened to permit the entrance of bacteria causing meningitis. The nasal drainage route was successfully closed. Suit was filed September 22. A second operation was later required to close off drainage through the place where the surgeon entered the skull.
 
 
 24
 Long after the surgery the neurosurgeon noticed adverse psychological symptoms, including anxiety, impaired memory and muscle tremors. He referred Nivens to a psychologist for testing. Both concluded that probably Nivens was suffering organic brain damage. The evidence is that the blow on the head and the subsequent corrective surgery could not have caused the kind of brain damage from which Nivens now suffers but could have enhanced a pre-existing brain disorder. As an unavoidable result of the brain surgery Nivens also suffered permanent loss of his sense of smell, and thus impairment of his sense of taste.
 
 
 25
 We agree with Signal that under the evidence, applying the standard of Boeing v. Shipman, 411 F.2d 365 (CA5, 1969, en banc), Nivens' claim had prescribed and the court should have granted Signal's motion for a directed verdict.[4] In R. J. Reynolds Tobacco Co. v. Hudson, 314 F.2d 776 (CA5, 1963), Judge Wisdom, a long-time practicing attorney in Louisiana, discussed for this court Louisiana principles concerning the commencement of prescription. He pointed out that the Code's focus is on when damage is "sustained" rather than the day of the act causing the damage, and that by judicial construction prescription runs from the time a plaintiff "knows or should know he has sustained damages." Reynolds held, in its factual context and as a logical and necessary extension of the foregoing principle, that to start the running of prescription plaintiff was required to have "knowledge of the relationship between the offense and damages sustained." Id. at 780.
 
 
 26
 In Lucas v. Commercial Union Insurance Co., 198 So.2d 560, 563-64 (La.App., 1967), the court discussed the triggering of prescription in varying situations:
 
 
 27
 With respect to actions for recovery for personal injuries, when the injury is immediately apparent, that is, when evidence or symptoms thereof are manifest simultaneously with the occurrence of the tort, no problem is encountered in determining the commencement date of prescription. In such instances prescription commences as of the date of the wrongful act. Marquette Casualty Company v. Brown, supra. Even though the full extent of the damage or loss may not be immediately ascertainable, nevertheless, if the aggrieved party is aware of claim resulting from the tortuous (sic) conduct, the entire claim, including that for damages not then determinable, prescribes in one year from the date of commission of the wrong. Marquette Casualty Company v. Brown, supra; Luke v. Caddo Transfer & Warehouse Co., 11 La.App. 657, 123 So. 444, 124 So. 625. In such instances, the cause of action is deemed to have arisen immediately, therefore prescription runs from the date of commission of the tort.
 
 
 28
 It is those instances wherein the personal injury does not arise immediately, or is not apparent conjointly with the commission of the tort, that serious problems are encountered in determining the date on which prescription commences.
 
 
 29
 In Cartwright v. Chrysler Corporation, 255 La. 598, 232 So.2d 285 at 287 (1970), the test was phrased this way:
 
 
 30
 Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of every thing to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription. (footnote omitted)
 
 
 31
 In Hunter v. Sisters of Charity, 236 So.2d 565 (La.App., 1970), the test was stated as whether the circumstances were "sufficient to excite plaintiff's attention, put her on guard and call for an inquiry."
 
 
 32
 Louisiana plaintiffs have sought unsuccessfully to escape the principle of these cases in several ways. In Luke v. Caddo Transfer & Warehouse Co., 11 La.App. 657, 124 So. 625 (1929), the claimant suffered immediate, severe and numerous injuries. He was confined to bed for 90 days and claimed to be permanently disabled. He sought to escape the bar of prescription by arguments that the period did not commence until he could definitely determine the results of his injuries, such as the length of hospital confinement and of disability, the duration of his pain and suffering, and the amount of his medical expenses. Alternatively he contended that the prescriptive period was not triggered until he knew that he would not die. The court swept away these arguments, pointing out: "plaintiff was damaged the moment the brick post and wall fell upon him. He was instantly injured and instantly damaged." * * * When the brick wall fell upon him, he was injured and instantly damaged, and his cause of action arose the moment he was damaged. The falling of the bricks upon him crushed his body and produced personal injuries." Id. at 626.
 
 
 33
 In Christian v. Daniell Battery Manufacturing Co., Inc., 279 So.2d 214 (La.App., 1973), the court rejected plaintiff's argument that the prescriptive period began to run only when his revealed injuries were known to be permanent. The plaintiff in Cartwright, supra, sued the driver of an automobile which rear-ended her when she was stopped at an intersection. The suit was dismissed on the ground that the accident was unavoidable because the brakes on defendant's car suddenly failed. Plaintiff then sued Chrysler, the manufacturer, charging that the brakes were defective. The court rejected plaintiff's theory that prescription should commence only when she became apprised of the real cause of the accident the defective brakes (and, inferentially, apprised of the identity of the defendant allegedly responsible for that cause). Hunter, supra, is a similar case. Plaintiff, a hospital patient, fainted and was lifted bodily by hospital employees and placed on her bed. She immediately began complaining of her injuries. Without success she contended that prescription began only when she became aware from medical opinion that the cause of her alleged injuries could have been the negligence of hospital employees in lifting her and placing her in the bed.[5]
 
 
 34
 Thus, Louisiana has rejected efforts to postpone the beginning of the prescriptive period until the results of injuries are known and amounts of losses can be ascertained (Luke ), until permanency of injury is known (Christian ), until the originating cause of the incident and the defendant responsible for that cause can be identified (Cartwright and Hunter ). Reynolds allowed postponement until there is knowledge of the relationship between offense and damage sustained.
 
 
 35
 In this case Nivens knew of the incident and, pretermitting the crack in the skull and the nasal drainage as a manifestation of abnormality, he knew that his injuries were from an identified cause by an identifiable defendant. He suffered pain, dizziness and nausea, headache effects sufficient to require him to lie down in his bunk for relief a red spot and a slight swelling which did not disappear, a firm, gristly place on his skin that caused him concern that it might be malignant. These manifestations of injury and injuries actually known were in every sense "sustained" under the Louisiana statute as construed. The effort to postpone the beginning of prescription must fail. The arguments that Nivens could have found no lawyer to file in federal court a claim for these damages, and that if filed such a suit might well have been dismissed on grounds of de minimis, are little better than frivolous. These are not the tests for whether damages have been sustained.
 
 
 36
 Obviously there can be a tortious impact but a total absence of manifestations tending to show damages.[6] Presumably there is room for a de minimis concept where there has been tortious impact but such inconsequential manifestations that a reasonable person would not consider he was either injured or that it was appropriate to make inquiry. This is not such a case. A jury might find that, pretermitting the skull fracture and drainage, Nivens did not consider his injuries serious or meriting his retaining a lawyer and filing suit. But they were injuries in a legally significant sense and were "sustained." Courts are regularly trying, and appellate courts regularly reviewing, numberless cases where the injuries are no greater.[7]
 
 
 37
 The facts mandate the result that must be reached. Nivens' claim had prescribed, not partially but in its entirety. He implicitly suggests that even if the earlier and revealed injuries were sufficient to trigger a prescriptive period, we should bifurcate the injuries caused by the single trauma and treat the later-found and more serious injury as the subject of another and delayed prescriptive period. This we cannot do. In the first place, it would not stand factual analysis. The injury to the exterior of the head was the red spot, slight swelling and ultimately the skin abnormality. This was accompanied by nausea and dizziness, classic symptoms of concussion usually arising from disturbance of the brain cells within the skull. Additionally, as we have pointed out, the major disability is from enhancement of a pre-existing brain condition, not from the fracture vel non or the operations vel non. Whether the enhancing effect came from only the fracture and the operations or was caused or contributed to by the blow apart from the fracture and operations, we do not know. The only basis for considering as a separate injury the hairline fracture, located in the same bony structure that was subjected to the blow and not far removed from the point of impact, is appellant's own characterization of it as separate. This is but an artificial construct laid out to avoid the argument rejected in Luke that prescription does not begin until the plaintiff knows how serious his injuries are.[8]
 
 
 38
 We find no Louisiana authority supporting Nivens' position. In Jones v. Texas & Pacific Ry. Co., 125 La. 542, 51 So. 582 (1910), defendant's mule was struck by a train and received a flesh wound insufficient to lame it, "although he manifested a disinclination or disability to move faster than in a walk." He was treated a few days for this wound, put in a pasture to get well and two months later died. Suit was filed more than a year from the death, claiming the loss of value of the mule, the loss of use until he died, and the expense of treating him. The trial court held the entire claim had prescribed. The Supreme Court reversed as to that part of the claim represented by the loss of the mule. It held, however, that the claims for temporary loss of use and for expenses of treatment had prescribed. Jones was a suit for injury to property rather than to the person, so that no claim for pain and suffering was involved. The Court pointed out that the flesh wound might not have diminished the mule's value at all:
 
 
 39
 Had plaintiff brought this suit before the death of the mule, a complete defense would have been that, for all that was known, the mule was as valuable as ever, barring the flesh wound, which would, doubtless, soon be healed. Until the fatal nature of the mule's injury revealed itself, therefore, plaintiff had no cause of action, and prescription did not run.
 
 
 40
 51 So. at 583.
 
 
 41
 While some of the broad language of Jones may give comfort to Nivens, its principles are inapplicable where the alleged injury creates an immediate right to sue. In Jones the Louisiana court reasoned that the mule's injury, though instantly sustained, did not produce an effect on value, and the cause of action for loss of the mule remained in the process of development until its death. In the case before us Nivens' cause of action accrued instantly when he experienced legally cognizable injury, pain and suffering.
 
 
 42
 Nor does Lucas, supra, aid Nivens' contentions. Indeed it nails down specifically the sharp dividing line between the period when injury is asymptomatic and the time it becomes symptomatic. Plaintiff therein allegedly was injured May 28, 1965, and examined by a doctor June 2, 1965. He sued June 2, 1966. His petition stated (with either intentional or accidental artfulness): "Upon going to a physician for a routine checkup on June 2, 1965, plaintiff discovered that he had been caused to suffer a sore tender neck, numbness in the right thumb and slight stiffness in the lumbosacral area as a result of the accident." The trial court sustained an exception of prescription determined on the face of the pleadings. Defendant asserted on appeal that plaintiff's allegation, quoted above, was a facial revelation that plaintiff was aware of his injuries from the date of his accident, that he did not need to consult a physician to be told that his neck was hurting (from May 28 to June 2). The Louisiana court construed the petition to allege that the injuries were asymptomatic from May 28 to June 2, 1965, on which date they first manifested themselves, and remanded with directions to permit plaintiff to produce evidence in support of this position. Unlike the Lucas plaintiff, immediately following the tortious impact Nivens knew he had sustained injury and thereafter evidenced symptomatic manifestations which were legally sufficient to ground a cause of action. The fact of injury was never asymptomatic, only its full extent.
 
 
 43
 There is not in this case on the part of Signal any active concealment or lulling of the plaintiff into inaction or any special relationship between Signal and Nivens that operates as an estoppel, which under some circumstances may delay the prescriptive period. See Perrin v. Rodriguez, 153 So. 555 (La.App., 1934), and the discussions thereof in Aegis Insurance Co. v. Delta Fire & Casualty Co., 99 So.2d 767 at 787 (La.App., 1957), and in Reynolds, supra, 314 F.2d at 784.
 
 
 44
 Nivens' case has considerable emotional appeal, and in a legal sense superficial appeal. A finder of fact could conclude that, like Nivens, a reasonable person aware of the nasal drainage would not have related it to the bump on the head. Fortuitously and despite his lack of awareness, Nivens made the kind of inquiry the statute of limitations contemplates. The result of his inquiry to several doctors, none of whom was told of the trauma, was that none found the hairline fracture until too late. Thus, for more than a year, with respect to this injury, Nivens' actions vindicated the policies of the statute. The defect in this argument is, of course, that it carves out the fractured skull and treats it in isolation as though the other and earlier-revealed injuries did not exist. Nivens' entire claim prescribed because the one-year period was triggered by the revealed injuries and the manifestations other than nasal drainage which we have described.
 
 
 45
 Reversed.
 
 
 
 *
 Of the U.S. Court of Claims, sitting by designation
 
 
 [1]
 The federal courts have jurisdiction of the action under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. The Act provides that state law shall apply, 43 U.S.C. § 1333(a)(2)
 
 
 [2]
 The third party claim was tried to the court which found for third party-defendant Louisiana Offshore
 
 
 [3]
 Nivens' position is that until more than a year elapsed he never related to any medical practitioner the occurrence of July 11, 1971. That correctly states the evidence that went to the jury. Whether during the year doctors asked him if he had suffered a blow on the head is not clear. While we do not rely upon it because we are unsure whether it was introduced in evidence, plaintiff's counsel quoted in a brief to the trial court Nivens' statement made in a deposition to the effect that the doctors would keep asking him if he had been hit on the head and he would tell them he had not, and, reminded that actually he had been hit on the head, his response was: "I was thinking I wasn't hit on the head, you understand."
 
 
 [4]
 This conclusion pretermits decision of Signal's argument that under Louisiana practice, and even in a federal court, the judge may never submit to the jury the question of prescription but must decide it himself
 
 
 [5]
 See also: Duhon v. LaFayette General Hospital, 286 So.2d 166 (La.App., 1973). Plaintiff sued doctors alleging malpractice in treatment and a hospital to which he subsequently was admitted, charging negligence in permitting him to fall from his bed. Presumably he claimed delay in knowing that his alleged injuries could have related to the fall from bed. The court affirmed a dismissal on grounds of prescription, saying:
 (W)e agree with the trial judge "that circumstances indicate that plaintiff had a basis for believing that perhaps he had been injured in the fall on December 16, 1969." Plaintiff and his wife testified that his wife was in the room when plaintiff fell and that she informed him of his fall a couple of days later. Also, Dr. Rivet informed plaintiff a second operation was needed to repair damage which could have been caused by plaintiff in his fall from bed. Plaintiff had sufficient facts to incite his attention and put him on guard and call for inquiry. Cartwright v. Chrysler Corporation, supra.
 Id. at 170.
 
 
 [6]
 See the discussion, infra, of Lucas, which draws the line between asymptomatic and symptomatic conditions
 
 
 [7]
 Injuries similar to those sustained by Nivens have been held compensable under Louisiana law. See Janice v. Whitley, 111 So.2d 852 (La.App.1959) (mild cerebral concussion causing slight headaches for four months); Ulmer v. Travelers Ins. Co., 156 So.2d 98 (La.App.1963) (contusion and small hematoma); Augello v. Call, 210 So.2d 129 (La.App.1968) (slight blow to head and anxiety reaction); Strother v. State Farm Mut. Auto Ins. Co., 238 So.2d 774 (La.App.1970) (contusion of forehead); Dickson v. Zurich Ins. Co., 261 So.2d 350 (La.App.1972) (bump on head). See also federal cases where personal injury claims, made in good faith, have withstood motions to dismiss for lack of jurisdictional amount, e. g., Mitchell v. Great Am. Indem. Co., 87 F.Supp. 961 (W.D.La.1950) (hematoma on head and strained shoulder); Lee v. Kisen, 475 F.2d 1251 (CA5, 1973) (smashed finger with bone chip not uniting)
 
 
 [8]
 Possibly a later-discovered injury can be "separate" in a physical sense, as, for example, a broken foot first discovered more than a year after immediately-revealed head injuries such as Nivens suffered. Such a case is for the Louisiana courts to decide on another day, although it is difficult for us to perceive that the policies of prescription can be met by a metaphysical approach of separating injuries one from another with possibly several different prescriptive periods
 A "little injury first, big injury later" situation was involved in Guderian v. Sterling Sugar & Ry. Co., 91 So. 546 (La., 1922). Plaintiff, who previously had lost the sight of his right eye, was struck over the left eye, causing a gash which received slight medical attention but gave him no concern and did not cause him to lose a day's work. Later it was found that the blow had detached the retina, and plaintiff lost the sight of the left eye. Judge Wisdom explained this case in Reynolds, supra, 314 F.2d at 782-83, not on the ground of the trivial nature of the gash over the eye but by a lengthy analysis pointing out that the cause of action arose under the Louisiana Employers' Liability Law, under which knowledge of the date of the occurrence, of some injury resulting from the act causing damage, and an objective manifestation of the injury, are not enough. There was no cause of action until the claimant lost the use of his eye. Compare Luke, supra, 124 So. at 626, where the court referred to Guderian as a case in which plaintiff suffered no immediate consequence this is factually erroneous.