LAND, Justice.
 

 The building at 806 Conti street in the city of New Orleans was purchased by plaintiffs in the year 1911. After living in this building and operating a grocery store there for a number of years, plaintiffs leased the property in 1922 to a tenant, who occupied the premises until about the year 1929, when plaintiffs resumed possession and operated a grocery there, but did not live on the premises. ■ About the year 1930 plaintiffs moved into the living quarters on the second floor of the building. From that time plaintiffs complain that the vibrations in their building have been so excessive as to cause the building, walls, and furniture to tremble and to deprive them of sleep and affect their health, and, in fact,
 
 to
 
 damage the building itself to such an extent as to necessitate repairs.
 

 Plaintiffs’ building adjoins the laundry plant of defendant company, and plaintiffs allege that the vibrations of which they complain originate from the operation of the machinery in this plant.
 

 The suit is, first, for damages to plaintiffs in the sum of $5,000 each, because of the impairment of their health through loss of sleep night after night for a period of three years; secondly, the plaintiff Guiseppe Di Carlo sues for the sum of $302.30, the cost of repairing cracks in the walls and plaster, alleged to have been caused by the vibrations; thirdly, plaintiffs ask for an injunction against defendant to restrain it from operating engines that cause undue and unnecessary vibrations.
 

 The lower court awarded damages to Mrs. Di Carlo in the sum of $1,000; to Mr. Di Carlo in the sum of $1,302.30; and enjoined defendant from operating its steam engines and electric generators in its laundry, with leave to apply for a modification of the injunction, on repair or adjustment of its engines and generators, so as to make them operate without causing excessive and harmful vibrations in plaintiffs’ property.
 

 From this judgment defendant has appealed.
 

 1. In Crump v. Carnahan, 155 La. 648, 99 So. 493, it is said: “There can be no doubt of the soundness of the rule that every person is required -to use his own property and to conduct his business in such a manner as not to cause undue annoyance, disturbance, and discomfort to his neighbors, nor to impair the reasonable enjoyment of his neighbor’s house. On the other hand, it is said that the consensus of the better judicial thought is that an occupation or business lawfully located and followed is never, per se, a nuisance, so that such an occupation is not to be denounced as a nuisance, except to the extent that it is a nuisance. Froelicher v. Southern Marine Works, 118 La. 1084, 43 So. 882.”
 

 As is usual in such eases; we are confronted with a mass of conflicting testimony, and the credibility of witnesses is necessarily involved.
 

 
 *679
 
 The trial judge inspected defendant’s plant and made two visits to the Di Carlo building, one in the daytime when all of the machinery was not in operation and the tests were rapidly made, and the other in the nighttime, when the electric generators propelled by the two horizontal reciprocating engines in defendant’s plant were in operation, and were charging the electric trucks of defendant.
 

 As stated in the written opinion of the lower court, the trial judge accepted the testimony of plaintiffs’ witnesses as trustworthy, especially as such testimony corroborated largely his own personal observations on the occasion of these visits.
 

 Plaintiffs’ testimony shows with clear legal certainty that the vibrations originate in defendant’s laundry plant, and . that they are excessive and abnormal. The testimony of plaintiffs’ witnesses in this respect is corroborated by the recordations on numerous occasions of these vibrations by a seismograph placed in the Di Carlo building.
 

 Mr. Di Carlo testified that he could not sleep upstairs until all the machines were closed down about midnight; that the vibrations cause him and his wife to become nauseated, and have injured the health of himself and wife for the past three years. In this testimony he is corroborated by his wife, who also complains that her nerves and digestion have been affected by the vibrations.
 

 Several witnesses for plaintiff also testify that they became nauseated by the vibrations in the Di Carlo building.
 

 The extent of these vibrations are also described by the trial judge, who visited the Di Carlo premises on two occasions: “Now, last night I sat against the wall in that house. I stood against a piece of furniture also. Standing, one’s body is, in effect, a pendulum. The feet move, but the upper part of the body tends to remain stationary, as that pendulum (of the seismograph) does; so that if a person stands near a piece of furniture which moves, the movement is apparent to him. The furniture appears to be bumping. That is what I observed last night.
 

 “It is unmistakable, and I can well understand that, continuing hour after hour, it would be unpleasant, so much so that it might make it impossible to sleep.
 

 “There is the evidence of the witnesses who are not impeached, and whose behavior in this case and whose manner of testifying gives me no reason at all to doubt what they say, that on other occasions the vibrations were very much more pronounced than they were last night, and that appears to be proved by the graphs taken at those times by the seismograph.”
 

 The condition of the engines in defendant’s plant also becomes an important factor in this case.
 

 They are reciprocating, horizontal steam engines of the flywheel balance type, with eccentrics in the flywheel, and operating electric generators. They are . fairly large machines. j
 

 Defendant admits: in its answer that they were installed in its plant in the year 1920.
 

 Mr. Todd, a mechanical and electrical engineer, and a witness for plaintiffs, states in his téstimony that: “About 12 years ago there were certain developments in engine manufacture that came about that made that type of engine more or less obsolete.” Tr. p. 49.
 

 
 *681
 
 Mr. McLean, also a witness for plaintiffs, and who has had a great deal of experience with the type of engines in defendant’s plant, states that the trouble with defendant’s engines is that they are unbalanced, and that this happens to all machines that vibrate of that type. Tr. p. 159.
 

 When asked, “What do you mean by unbalancing?” the witness replied:
 

 “A. There might be a slight bend in the shaft, although that was not apparent yesterday, but sometimes a bend can be there without being able to see it. There may be an unbalancing in the windings of the armature, which is a very usual thing. It may be that some part of the fly ball governor, which is a momentum and weight operated affair, may be out.”
 

 After stating that it was very difficult to keep these engines from “dancing around the place,” the witness said: “I mean that type of engine frequently has that trouble — gets out of balance and vibrates a good deal. I have seen very few that did not after they were a few years old.” Tr; pp. 160,161.
 

 Mr. Todd also testified: “That there would be some vibration if there was any unbalancing in the governing mechanism of the machine, if there is any eccentric weight conditions there. The attempt is usually made to balance a governor by counterbalance weights, but if there is not 100 per cent, balance, there would be some vibration from that as well.” Tr. p. 174.
 

 In commenting on the engines of defendant, the trial judge said: “These engines have to be kept in repair. They have to be kept in adjustment I am told that there is a governor in the flywheel which regulates the speed of the engine and holds it to its designed speed of 230 revolutions to the minute. That device may well be at fault But at any rate, the facts prove, the results prove, that something is wrong with the engines, and that causes vibration.”
 

 The results, as shown by the accepted facts of the case, cannot be reconciled with the testimony of defendant’s witnesses that its engines do not vibrate, are in good condition, and are of a standard type.
 

 Mr. Herpich, expert for defendant, testified that reciprocating engines do cause vibration, “if they are not in order, if they are not kept up, if they are pounding,” and that “a reciprocating engine in good order will not cause vibration.” Tr. p. 254.
 

 Plaintiffs do not contend that the laundry plant should be shut down, but that the vibrations are unnecessary and can be eliminated by installation of good machinery or by the proper repair and efficient maintenance of present engines.
 

 The case involves purely a question of fact which was peculiárly within the province of the trial judge. He solved the issue in favor of-the plaintiffs and we cannot say that he erred.
 

 2. Defendant has filed a plea of prescription to any claim for damages suffered by plaintiffs more than a year prior to the filing of this suit.
 

 In our opinion, the plea of prescription is not well founded for two reasons.
 

 In the first place, the nuisance of which plaintiffs complain is of a continuing nature and of daily renewal.
 

 
 *683
 
 In Werges v. St. Louis, C.
 
 &
 
 N. O. R. Co., 35 La. Ann. 641, this.court said: “As the damages claimed are predicated on alleged continuous wrongful acts, causes which are supposed to occur daily, and to produce effects daily repeated, we are of opinion that the plea cannot be sustained in law, and it must therefore be overruled. ‘In such cases, prescription, whatever the length of time, has no application.’ Fertilizing Co. v. Hyde Park, 7 Otto [97 U. S.] 659, 668 [24 L. Ed. 1036].
 

 “In such cases, when — ‘the injury is of a continuing nature, the cause of action continues and is renewed de die in diém, as long as the cause of the continuing damage is allowed to continue.’ Addison on Torts, p. 1163.”
 

 Even if a plea of prescription were permissible in this case, plaintiffs would not have to show what part of their damages was suffered during the preceding year, as contended by defendant, since the burden rests upon the party pleading prescription “to show what portion of the damages proved occurred anterior to the year preceding the institution of the suit or, in other words, to prove what part of the plaintiff’s demand is prescribed.” De Lizardi v. N. O. Canal & Banking Co., 25 La. Ann. 414, 416; Drews et al. v. Williams, 50 La. Ann. 579, 584, 23 So. 897.
 

 As the judgment is silent as to the plea of prescription presented to the lower court, it must be considered overruled. State v. Nephler, 35 La. Ann. 365; Soniat v. Whitmer, 141 La. 235, 74 So. 916.
 

 3. It is testified by Mr. Favrot, general contractor, that it would cost $302.30 to repair the cracked walls in plaintiffs’ building. Three years prior to these repairs, plaintiffs paid $1,100 to have these walls newly plastered and painted. While the ultimate cause of these cracks in the wall was the settlement of the building, the trial judge, in allowing the demand of $302.30 for repairs to the cracked walls, must have concluded that the settlement of the building was due to the continuous and abnormal vibrations in the building, emanating from defendant’s laundry plant. We are not prepared to say that the lower court erred in such holding.
 

 Judgment affirmed.