355 So.2d 963 (1977)
Mrs. Violet M. DERBOFEN, wife of Gail T. Kreher, and Mrs. Florence Juncker, widow of Dr. John C. Derbofen
v.
T. L. JAMES & COMPANY, INC., Succession of Joe W. Brown, No. 368-953, Civil District Court, Orleans Parish of Louisiana, Mrs. Dorothy Dorsett Brown, Individually and as Testamentary Executrix of the Succession of Joe W. Brown, George Dallas Williams, Sabine Dredging and Construction Company, Inc., and T. M. Dorsett.
No. 7126.
Court of Appeal of Louisiana, Fourth Circuit.
October 20, 1977.
Writs Refused May 5, 1978.
*964 John M. Mamoulides, Gretna, Gail T. Kreher and Abbott J. Reeves, New Orleans, for plaintiffs-appellees.
Hurley, McNulty & Stakelum, Paul E. Hurley and P. J. Stakelum, III, New Orleans, for defendants-appellants.
Before SAMUEL, LEMMON, BOUTALL, SCHOTT and BEER, JJ.
LEMMON, Judge.

DECREE
The result of the attached opinions, stating the votes of the members of the fivejudge panel on the merits of this case and the reasons therefor, is a judgment for plaintiffs in the amount of $1,494.00, plus legal interest from October 30, 1958, and all costs in both courts.
LEMMON and BEER, JJ., concur in the decree and assign reasons.
SCHOTT, J., concurs in the decree only and assigns reasons.
BOUTALL, J., dissents from the decree and assigns reasons.
SAMUEL, J., concurs in part and dissents in part and assigns reasons.
LEMMON and BEER, JJ., vote to amend and affirm on the merits and assign reasons.
BOUTALL, J., votes to affirm and amend on the merits and assigns reasons.
SCHOTT, J., dissents on the merits and assigns reasons.
LEMMON and BEER, Judges, concur in the Decree and assign reasons.
The members of the five-judge panel have taken different points of view as to why the five votes (stated in the attached opinions on the merits) result in a judgment for plaintiffs in the amount of $1,494.00. We therefore state our reasons for agreeing or disagreeing with the decree separately from our divergent opinions on the merits of the case.
A defendant had appealed from a judgment for plaintiffs in the amount of $183,112.30. On appeal we (Judges Lemmon and Beer) voted for judgment for plaintiffs in the amount of $1,494.00, Judges Samuel and Boutall voted for judgment for plaintiffs in the amount of $199,637.50, and Judge Schott voted for judgment for defendant.
In our view there are two reasonable approaches to the decision that these votes result in the stated decree. One point of view is that since defendant sought relief by appeal, the effect of Judge Schott's vote, combined with our votes, is to grant that relief, at least to the extent of a reduction of $181,618.30. Under this view the effect of Judge Schott's vote for the ultimate reduction (to zero) resulted in three votes concurring to reduce by $181,618.30 to $1,494.00, since a vote for a greater reduction encompasses a vote for a lesser reduction.
The other point of view is that there are four votes to award a judgment to plaintiffs, and the effect of the votes of Judges Samuel and Boutall to award judgment in the amount of $199,637.50, combined with our votes, is to award a judgment of at least $1,494.00, since a vote for a greater award includes by inference a vote for at least the lesser award.
Either point of view appears plausible to us. We agree that the result of our votes is a judgment for plaintiff for $1,494.00, and it matters not whether one voter believes another's vote caused this result. There is no doubt as to the decree, and the disagreement as to why this decree resulted from the votes does not affect the decree itself.
SCHOTT, Judge, concurring in Decree only.
Because this court is required to sit in panels of at least three judges and five under the circumstances present in this case, and because a majority must concur to *965 render a judgment, Art. 5, § 8, Constitution of 1974, we are presented with somewhat of a riddle in deciding what decree has emerged from the diverse opinions of the judges who have participated in the case.
The judgment of the trial court is in favor of plaintiffs and against defendants for $183,112.30. I would reverse this judgment and dismiss plaintiffs' suit. All of my colleagues agree that the judgment should be affirmed but two would amend the amount to $1,494.00, while the other two would amend the amount to $199,637.50. Since the lesser amount is included in the greater, all four concur in an award of $1,494.00.
Nevertheless, Judges Samuel and Boutall will not sign the decree awarding plaintiffs $1,494.00, and while they have espoused good reasons for this decision I submit with all due respect to my colleagues that they are in error. In my opinion, by their decision, Judges Samuel and Boutall have unintentionally concurred in the award made by Judges Lemmon and Beer for $1,494.00, and that has become the judgment of the majority of this court.
The result reached in this case is indeed bizarre with the one judge of this court who would reverse the judgment of the trial court and dismiss plaintiffs' suit, being required to join in a decree which effectively affirms the judgment of the trial court. But I perceive the effect of the judgment of two of my colleagues differently than they do. The case must be decided by the court of which I am a member, and it is the decree of the court in which I concur, although I am convinced that my basic position is correct, i. e., the judgment should be reversed and plaintiffs' suit dismissed.[1]
BOUTALL, Judge, dissenting from Decree.
The result of our consideration of this case before a 5 man panel is that 2 judges would decrease the award in plaintiff's judgment, 2 judges would increase the award, and 1 judge would reverse the judgment, granting plaintiff nothing. The Constitution of 1974 Art. 5 § 8(B) requires "a majority must concur to render judgment." Is there such concurrence here?
In all cases before the courts of appeal the basic inquiry is whether the trial court judgment is correct. This judgment can only be modified or reversed by a majority vote. When a judgment is modified by the Court, the starting point of the modification is the judgment itself. Thus, when the judgment awards money and the modification is quantum, an effective decree is produced when a majority concurs at the least amount of the reduction or the least amount of the increase. See for example Lowe v. Gentilly Dodge, Inc., 342 So.2d 1231 (La.App. 4th, 1977). To some degree this principle supports the same basic principles behind cases like Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) in the setting of damages.
In this case it could be said that 4 judges have concurred that plaintiff is entitled to recover, but what shall he recover? Here, 2 judges have said the award shall be decreased and 2 have said the award shall be increased. The disparity in the amounts of award is not simply a dispute over discretionary general damages as per C.C. Art. 1934(3), but is caused by dispute over the legal basis for setting the award. Thus I say that I do not concur in the proposed decree and that this case should be placed before the court en banc for consideration. The amount I would award is so close to the trial judgment that I could conscientiously affirm it, but I cannot concur in the proposed decree.
Prior constitutional provisions have provided methods of appointing other judges or attorneys in order to arrive at a majority concurring. Our present constitution does not so provide but neither does it limit us to panels of three judges or five judges. Under our inherent powers we can sit en banc and hopefully reach a majority. See Dauzat v. Allstate Insurance Co., 257 La. 349, 242 So.2d 539 (La.1970).
*966 However, three judges have now concurred in a decree for expressed reasons, so that the constitutional mandate has been fulfilled. While I do not approve of the third judge's reasons, I do commend him for moving this ancient case forward to final resolution.
SAMUEL, Judge, concurring in part and dissenting in part.
I agree with the reasons expressed and the conclusions reached in the "Affirming and Amending on the Merits" opinion of Judge Boutall. Accordingly, I concur in the majority decree that plaintiffs are entitled to recover additional damages, but I dissent from that portion of the now majority decree which awards only $1,494 as I would set those damages at $199,637.50 as does Judge Boutall.
In addition, because my fellow judges on the panel have stated their views as to what the decree would be if Judge Schott had not concurred in the now majority decree and despite the fact that such opinions are dicta, I feel it necessary to give my own views on that question.
With reference to the Louisiana Courts of Appeal, Article 5, Section 8(B) of our 1974 Constitution specifically provides that a majority of the judges sitting in any case "must concur to render judgment" (emphasis added). As I see it, "concur" means and requires an affirmative action on the part of the concurring judge.[1] In other words, in order for a judge to concur in a decree he must affirmatively say he concurs. Thus, when the conclusions of this five judge panel were two for a $199,637.50 award, two for a $1,494 award and one for no award, the result was no judgment at all. Certainly, it cannot be said that I concurred in a decree awarding $1,494 because in my opinion the award should be $199,637.50 simply because the greater includes the lesser, or on any of the other various views expressed by my colleagues, when I did not concur in the lesser amount and actually dissented therefrom. The decree in this case is now a majority decree and the judgment of the court simply because Judge Schott has stated he concurs in the $1,494 award, a concurrence deserving commendation because it brings this too long delayed matter to an end as far as this court is concerned.

ON THE MERITS
LEMMON and BEER, Judges, amending and affirming on the merits.
This litigation involves a trespass by agents of T. L. James & Company onto plaintiffs' property in the course of dredging operations. This suit is the second filed by plaintiffs, and this appeal is the third time the matter has come before this court. Although the record is voluminous, the facts pertinent to this appeal are virtually undisputed, and the issues now before us are essentially legal ones, being (1) whether the plaintiffs under the circumstances of this case can recover an additional award in this second suit after a judgment in the first suit has already granted an award for the trespass, and (2) if so, the proper method of determining the amount of the award.
Facts
In the early 1950's plaintiffs owned a five-acre tract of land, known as Grove 57, in eastern New Orleans. The land was generally low and subject to tidal overflow, and the area was largely uninhabited.
Having contracted to construct the base for Interstate Highway 10 in the vicinity of Grove 57, T. L. James negotiated an agreement with the owner of an adjoining tract of land, who desired to have a lake dug on his property. The contractor dredged the lake in 1957 and utilized most of the excavated material in the construction of the road base, compensating the owner for the material on an agreed basis. During the course of the dredging, the contractor inadvertently dredged completely across the center of Grove 57, excavating about 80,025 *967 cubic yards of fill material over a surface area of 2.236 acres.
When plaintiffs learned of the trespass, they filed a suit in 1958, seeking to recover damages itemized (1) for removal of the soil at an asserted price per yard, (2) for destruction of trees and vegetation, and (3) for loss of use and enjoyment, reserving the right "to claim future damages for the continuing trespass". The suit also demanded that the court order T. L. James to restore the property to its former condition, reserving the "right to claim damages for indemnification of necessary expenses to be incurred on account thereof in the event of defendants' failure to so do".
The trial court found the admitted trespass was in good faith and rendered a judgment for $6,044.00 against T. L. James. Noting that the sole issue was the quantum of damages to be awarded for the trespass, the court awarded damages based on "the difference in the market value of the property as a whole before and after the injury".[1]
Plaintiffs appealed, and this court granted a higher award, taking a different view of the measurement of damages. After mentioning plaintiffs' request for restoration of the property (noting "they have asked for no alternative moneyed judgment for this") and their two reservations of "rights", the court concluded "the only item of damages we can consider is the value of the dirt in place on plaintiffs' property at the time it was removed".[2] (Emphasis supplied) The court then awarded plaintiffs 20 cents per yard, or $16,005.00, based substantially on T. L. James' net profit on the dirt removed in the entire project. The court further amended the judgment to reserve "plaintiffs' right to sue for future damages as prayed for in their petition . . . ." See 148 So.2d 795 (La.App.1962).
After applying unsuccessfully for a rehearing, plaintiffs did not seek review of our judgment, but immediately filed the present suit, alleging they had been "damaged by the continuing trespass" and claiming "damages for indemnification for necessary expenses to be incurred" for removal of the water and restoration of the original contour, for engineering and other fees, and for loss of use to date.
After extensive periods with little action, an exception of prescription was filed and was maintained by the trial court. On appeal from the judgment maintaining the exception, this court reversed, holding that since the same cause of action was asserted in each suit, prescription had been interrupted by the filing of the first suit.[3] See 274 So.2d 734 (La.App.1973).
On remand, the case was tried on the merits, and in December, 1974 judgment was rendered against T. L. James. The trial court, reasoning that plaintiffs "have the right to damages for the trespass" and that the trespass had continued up to the date of trial, determined that those damages should be measured by the 1974 value of the portion of Grove 57 injured by the 1957 dredging. Since 97,400 square feet of Grove 57 was covered by water and since fully developed estate sites in the prestige subdivision then surrounding Grove 57 sold for as high as $1.88 per square foot, the court set the damages at $183,112.30.[4]
That judgment is now before us for review.
*968 Continuing Tort
The trial court erred in finding that a continuing trespass existed 17 years after the dredging operations were completed.
A continuing tort is one in which the damage-causing act continues over a period of time.[5]DiCarlo v. Laundry & Dry Cleaning Service, 178 La. 676, 152 So. 327 (1933). A continuing trespass must be distinguished from a trespass which causes continuing injury by permanently changing the physical condition of the land. See Restatement, Second, Torts § 162, Comment e (1965).
When a trespass which permanently changes the physical condition of the land is concluded, no additional causes of action accrue merely because the damage continues to exist or even progressively worsens. Griffin v. Drainage Commission, 110 La. 840, 34 So. 799 (1903). The problem in this case, therefore, is one of measuring damages at the time the dredging operation was concluded, and not one of assessing damages for successive causes of action accruing because of a continuing tort.[6]
We conclude that there was no continuing tort in this case after the dredging operation was completed. Plaintiffs' right to recover an additional award in this suit therefore depends upon the effect of the reservation of rights recognized by the prior panel of this court.
Exceptions of Res Judicata, Estoppel by Judgment and Improper Division of an Obligation
T. L. James initially reurges its exceptions which were overruled by the trial court.
For the exception of res judicata to apply, the demand must be between the same parties and founded on the same cause of action, and the thing demanded must be the same. C.C. art. 2286.
Concededly, the demand in this case is between the same parties who were involved in the earlier action. Since we have concluded there was no continuing tort beyond 1957, the test of identity of causes of action is also met.[7] Finally, the thing demanded in both suits was reparation of tort-caused injury, and it would appear at first blush that relitigation of that demand is barred by res judicata.
As to the tort obligation, C.C. art. 2315 obliges him whose fault caused damage to repair it. Plaintiffs' petition in the first suit itemized only some of the cost of reparation due under the tort obligation imposed on T. L. James by C.C. art. 2315, but failed to itemize a cost for restoring the property, attempting instead to reserve the right to demand this item of damages later.[8]
However, at the first trial the pleadings were expanded when both parties introduced evidence without objection as to the cost of restoring the property to its original condition. Either the trial court (under C.C.P. art. 862) or the appellate court (under C.C.P. art. 2164) could have decided the issue of whether plaintiffs should be awarded the cost of restoration as an item of damages. However, this court did not either grant or deny recovery of the cost of restoration, but specifically declined to adjudicate *969 that issue, although it was properly before the court.[9] Furthermore, in the decree this court reserved "plaintiffs' right to sue for future damages as prayed for in their petition".[10]
Considered together, this court's refusal to adjudicate the issue and our reservation of plaintiffs' rights "prayed for in the petition" could reasonably have led plaintiffs to believe that they had the option of seeking certiorari or of filing an itemized demand for the cost of restoration by either a supplemental petition or a second suit.
Res judicata cannot apply to issues which a previous panel of this court has refused to adjudicate, and it would be patently unfair for this panel to apply the doctrine of res judicata. Because of these unusual circumstances, we reluctantly conclude that the exceptions were properly overruled.
Method of Determining Award
Plaintiffs argue that under C.C. art. 508 they had the right to demand "demolition of such works", and they contend the article gives them the right to demand removal of the lake and restoration of the property to its original condition.[11]
We reject the applicability of C.C. art. 508, which is found in Title IIOf Ownership, Chapter 3Of the Right of Accession to What Unites or Incorporates Itself to the Thing, and Section 1Of the Right of Accession in Relation to Immovables. This case does not involve the right of accession, and neither is the ownership of the lake involved. In our view this case involves reparation of tort-caused damages to property.
The basic concept of tort reparation required by C.C. art. 2315 is that the tort victim should be restored, as nearly as possible according to the particular circumstances of each and every case, to the position he enjoyed prior to the tort-caused damage. No hard and fast rule can be formulated for reparation of every tort victim, and each case must be decided equitably under its own particular facts and circumstances.
In the present case plaintiffs (and the heirs of some plaintiffs) had purchased the five-acre tract of land as an investment, and at the time of the tort plaintiffs were still holding the land for investment purposes. None of the plaintiffs had ever seen the land prior to the tort because of the physical character of the general area in which the land was located. Significantly, there was a considerable amount of similar undeveloped land in the area which was on *970 the market at the time and available for investment purposes.
Under these circumstances we believe that the damage to plaintiffs' investment property could most justly be repaired by awarding the full value of the virtually destroyed property so that plaintiffs could replace their land held for investment with other similar land in the area, which they could likewise hold for investment.[12] Additionally, plaintiffs would be entitled to any other damages sustained, such as loss of use during a reasonable period to allow replacement, but no such damages were proved in this case.[13]
Therefore, as of the date of judicial demand, October 30, 1958, T. L. James was obliged (if ultimately cast in judgment) to pay plaintiffs the 1957 value of the property. Because of the peculiar procedural circumstances of this case, that obligation still remains unpaid in part. Nevertheless, although the value of property in this area has become greatly enhanced, plaintiffs are not entitled to an award of the enhanced value of the property because T. L. James failed to pay the cost of reparation upon judicial demand and prior to judgment.[14] While plaintiffs are entitled to interest from the date of judicial demand, they are entitled to judgment only in the amount of the 1957 value of the property. Of course, T. L. James is entitled to a credit for the amount previously paid in accordance with an earlier judgment of this court awarding partial reparation.
The value of the property in 1957 was $17,500.00.[15] The previous award by this court was $16,006.00. Accordingly, the judgment in this case should be the difference between the two sums, or $1,494.00, plus interest from the original date of judicial demand.[16]
We vote to render judgment accordingly.
BOUTALL, Judge, affirming and amending on the merits.
I would affirm the judgment appealed as to plaintiffs' right to recover damages, but *971 I disagree with the basis of the award and would amend the judgment only to increase the amount awarded.
The basic issue in this case is the right of an owner of immovable property to compel a trespasser to take away or demolish a structure installed by the trespasser and the measure of damages for failure to do so under the provisions of Louisiana Civil Code Article 508. The issue has been compounded by the various pleadings and procedural steps as set out in the majority opinion.
There is no need here to recount these events, and I refer to the opinion authored by Judge Lemmon as well as our prior opinions in Derbofen v. T. L. James & Co., 148 So.2d 795 (La.App.1962) and Kreher v. T. L. James & Company, Inc., 274 So.2d 734 (La.App.1973). Suffice it to say that in the original petition filed by plaintiffs there were allegations in support of a prayer for relief requiring that the defendants remove the lake built upon plaintiffs' lands, and that, upon defendants' failure to remove the lake, monetary damages be assessed.
In our 1962 decision, at 148 So.2d 797, the court made the following statement:
"It will be noted that the plaintiffs in addition to reserving their rights to claim future damages for the continuing trespass, as set forth, also pray that the defendants be required to remove the water standing on their property and reserve their right to claim damages for indemnification of necessary expenses to be incurred on account thereof in the event the defendants failed to do so. They have set no monetary value on this and pray for none."
In that same 1962 decision, at page 800, the decree reads:
"For the reasons assigned, the judgment of the lower court is amended by increasing the award to plaintiffs to $16,005, and by further reserving plaintiffs' right to sue for future damages as prayed for in their petition; in all other respects the judgment is affirmed."
A reading of that judgment, emphasized by the above quotations, makes it clear that the reservation of plaintiffs' right to sue for future damages included not only future damages for continuing trespass but also plaintiffs' right to claim damages for indemnification of necessary expenses to be incurred in the event defendants failed to remove the water standing on their property.
Neither form of relief is now banned, as defendants argue, by either res adjudicata or estoppel by judgment. Neither party to that appeal applied for writs of certiorari or review to the Supreme Court and that judgment became final and definitive, acquiring the authority of the thing adjudged. C.C.P. Article 1842. Since the parties in that appeal are also the parties presently before the court, that judgment became the law of the case controlling the litigation between the parties. Day v. Campbell-Grosjean Roofing & Sheetmetal Corp., 260 La. 325, 256 So.2d 105 (La.1972). It would be an evident injustice to prevent plaintiffs from prosecuting those rights which they had in the first case and urged before the court, when the court, instead of ruling directly upon that issue, reserved their right to seek damages anew.
Despite allegations of continuing trespass to plaintiffs' land and mandamus to order removal of the water, plaintiffs' rights are encompassed by the provisions of Louisiana Civil Code, Article 508. The facts are simply that a contractor entered a contract with an adjoining landowner to remove soil from a certain portion of that landowner's property and create a lake for his enjoyment. The edge of the lake was dug in such a manner that it proceeded through the middle of the plaintiffs' tract of land and protruded into property on the other side. Plaintiffs had the perfect ownership of the violated property, and as such had the right to use and enjoy it in the most unlimited manner. Civil Code Article 491. Ownership of the land carries with it the ownership of all that is directly above and under it. Civil Code Article 505. This article accords to the owner the right of constructing below the soil all manner of works, digging as deep as he deems convenient, and to draw from these constructions *972 all the benefits which may accrue. All the constructions made within the soil are supposed to be done by the owner. Article 506.
When a third person makes such constructions, the owner of the soil has the right to keep them or compel this person to take away or demolish the same. Article 508. In accordance with that article if the owner requires the demolition or removal, this shall be accomplished at the expense of the person who made the construction without any compensation, and such person may be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.[1] The construction of a lake upon the property of plaintiffs is encompassed within the provisions of the above cited articles. The owners are thus accorded the right to demand its removal or compensation for the necessary expenses which may be required to remove it. The owners cannot be required to keep the construction upon their property in derogation of our Codal law. They have a right to the full enjoyment and use of the property and cannot be compelled to use a portion of it as a lake against their wishes.
The position taken by two judges herein is that the landowners are only entitled to damages commensurate with the value of the property. While tortious acts of man may require reparations under Civil Code Article 2315, which have been limited to value of replacement in fungible items, this is not such a case. Article 508 requires removal and damages, not compensation of value. To hold that an owner is entitled only to compensation to the extent of the value of the property is to require that he use his property only as someone else should dictate to him, and amounts to a taking of property in violation of Constitution of 1921, Article 1, § 2. Private property cannot be taken or damaged except for public purposes. In our 1962 decision, we pointed out that the trial court was in error in considering the market value of the property in its determination of loss. A private individual or corporation such as defendant here has no expropriation authority permitting it to pay value of real estate taken contrary to the owners' wishes. There is no basic difference between a third party coming upon an owner's property and erecting a building above ground which would deprive him of use of half of his property or constructing a lake which deprives the owner of the use of half of his property. In either case the owner has an absolute right of requiring removal or expenses of removal in the event of failure to remove.
The defendants have refused to remove the lake they have constructed, and the only apparent basis for their refusal to do so is the expense involved. The original dredging of the lake occurred some time in 1957, suit was filed in 1958, and the matter has been dragging through the courts ever since. The record reflects the enormous increase in the cost of restoring the property from that time down to the latest trial from which this appeal springs. However, the owners are prevented from obtaining present day expenses for two reasons; 1.) an injured person must mitigate his damages and thus he cannot wait a long period of time after his demand of restoration so that his damages would increase; and 2.) a large part of the elapsed time was due to voluntary negotiations between the parties, and plaintiffs may not take advantage of their voluntary granting of negotiating time. The expense of restoration in this case should be fixed at the time of the original demand.
The record discloses sufficient evidence to make this determination, there having been a vast difference between the owners and the defendants as to the amount necessary to restore the property. The owners introduced evidence to show that restoration would require the placement of 162,666 cubic yards of fill at $1.41 per cubic yard, plus $17,000 for the work required to shape the fill into place or a total cost of $246,359.04. *973 The defendants on the other hand have introduced evidence to show that 125,000 cubic yards of fill were necessary at a cost of $36,000 (presuming free fill obtainable).
The proposition put forth by T. L. James was based upon availability of its equipment in the area and its ability to obtain free fill from an adjoining landowner. Its proposition cannot be considered as a true basis for costs of a restoration that it will take no part in. Instead, the record discloses that T. L. James's contract for furnishing the excavated fill to the highway department at $1.50 per cubic yard cost it $1.4611 per cubic yard. Using these figures for yards of fill and costs, a more accurate and realistic amount of cost is $182,637.50, to which should be added the $17,000 deemed necessary by plaintiffs for handling of the fill, or a total of $199,637.50.
The major difference between these two totals is the amount of fill necessary. While there is no disagreement basically as to the amount necessary to fill the hole on plaintiffs' property, the difference arises because of the angle of slope or repose necessary to hold the fill in place against continued wave wash from the lake. There is no evidence showing the lesser protection plan of defendants to be inadequate. Thus, I would fix the amount necessary to remove the illegal structure at $199,637.50. In view of our prior decision, I would fix interest at the legal rate beginning with the judicial demand in the present suit.
SCHOTT, Judge, dissenting.
I would not allow plaintiffs to recover under either one of the theories adopted by my colleagues because the exception of res judicata bars plaintiffs from such recovery.
When this case was before this court the last time, 274 So.2d 734, the court discussed the merits of defendants' exception of res judicata at p. 739, and declined to pass on the exception because the appeal was limited to one from a judgment on an exception of prescription and in any event there was no evidence relative to the exception of res judicata. The court said:
". . . Under these circumstances a determination of those exceptions [judicial estoppel or res judicata] at this time would require speculation on our part. Facts established on the trial of the merits might bar plaintiffs from some of the items of damages they claim and such facts are not sufficiently apparent on the record before us." (Emphasis supplied)
Two of my colleagues would award plaintiffs the cost of removal of the water from and restoration of the contour of their land. Significantly they arrive at the amount of damages based upon the evidence taken at the first trial of this case which was on appeal to this court in 1962, 148 So.2d 795. My colleagues would now award to plaintiffs the very same amount which plaintiffs sought and which this court in 1962 declined to award.
A review of that first case shows that plaintiffs sought to recover three items of damage: First, the removal of dirt from their land; second, the destruction of vegetation and trees; and third, deprivation of the full use and enjoyment of the premises to that date. The court found that the evidence was insufficient to support an award to plaintiffs for the destruction of vegetation and trees. As to the deprivation of the full use and enjoyment of their premises, the court noted that plaintiffs did not allege that they were deprived of any of their property but only that a large portion of their property was covered by a lake. The court further noted that plaintiffs did not ask for severance damages or for damages by reason of a diminution in value of their property. They did ask that defendants be enjoined to remove the water standing on their property, but they asked for no alternative monied judgment for this item. All of the evidence as to the amount of money it would have taken to restore plaintiffs' property was then before the court, but the court declined to make the award because plaintiffs had failed to ask for this alternative relief. The court then concluded that "the only item of damages we can consider is the value of the dirt in place on plaintiffs' property at the time it was removed."
*974 By taking this action it appears to me that the court effectively adjudicated plaintiffs' rights with respect to any and all then existing and present damage which plaintiffs suffered. As a consequence, the court decreed that plaintiffs were entitled to an award of $16,005 for the value of the dirt removed, and the decree included the reservation in plaintiffs' favor "reserving plaintiffs' right to sue for future damages as prayed for in their petition."
I would paraphrase this decree as reserving to plaintiffs the right to sue for those damages which they would suffer in the future but limited to the extent that they prayed for such future damages in their petition. By reference to their petition, plaintiffs prayed as follows:
". . . and reserving the right to petitioners herein to claim future damages for the continuing trespass as set forth above, and that defendants herein be required to render and make petitioners' property safe and secure from future damage, and to remove water standing thereon, and generally undo the wrong which they have done, reserving to petitioners their right to claim damages for indemnification of necessary expenses to be incurred on account thereof, in the event of defendants' failure to do so;. . ."
In the first place, the presence of the lake on plaintiffs' property with the damage they suffered by reason of defendants' failure to remove the lake had already occurred, and it could not become a future damage when it was already in existence. The reservation in plaintiffs' petition was one to claim future damages and this reservation was recognized by this court in the first case before us. Assuming that this case is governed by LSA-C.C. Art. 508 and that the lake on plaintiffs' property is equivalent to the "works" discussed in the article it seems that plaintiffs' claim for the expense of removal of the lake had already accrued when the first case was decided. Defendants had already declined to remove the lake and plaintiffs were already entitled to a judgment for the expense of such removal. When the case was before this court the first time, under Art. 508 plaintiffs were already entitled to collect the amount which my colleagues would now award. Because plaintiffs failed to apply to the Supreme Court for a writ of review the first judgment of this court became final and the matter was res judicata. Yet my colleagues would now make an award to plaintiffs for removal of the lake.
The only item of damages which were reserved to plaintiffs by this court, and which an attempt was made to prove at the latest trial, is the claim for damages based on alleged erosion of plaintiffs' remaining land over the years since the suit was originally filed and the amount claimed to make the remaining property safe and secure. Apparently, plaintiffs did understand that this may be the result of the earlier opinions of this court because they did plead such damage and attempted to prove such. They are not entitled to recover this item, not because of res judicata since this claim was available to them under the reservation given to them by this court, but because the evidence does not support their claim.
I cannot agree with my colleagues who would award plaintiffs the value of their property as of the time of the trespass subject to the credit for the amount awarded by this court in the first case. The very issue before the court in the first case was plaintiffs' right to recover for the value of the property taken, and this court held that plaintiffs were not entitled to recover on this theory. They specifically limited plaintiffs' recovery to the value of the dirt and place as opposed to the value of the property which had been taken, and yet my colleagues would now make an award to plaintiffs based upon what plaintiffs could have purchased a similar piece of property for just after the trespass was committed. This seems inconsistent with the original case before this court and such relief would seem to be likewise precluded under the doctrine of res judicata.
Accordingly, I respectfully dissent from the decree and the opinions of my colleagues.
NOTES
[1] A similar, though less complicated, problem existed in Lowe v. Gentilly Dodge, Inc., 342 So.2d 1231 (La.App. 4th Cir. 1977). See footnote 2 on page 1234.
[1] In this connection see Black's Law Dictionary 4th Ed. Rev. 363 "concur" and W. & P., 588, 589, "concur" and "concurrence".
[1] An expert appraiser estimated the value of the entire Grove 57 before the trespass at $17,500.00 and the value of the two parcels separated by the lake after the trespass at $11,456.00. The difference, $6,044.00, was the amount of the award.
[2] The court noted that the two other items of specified damages (destruction of trees and loss of use) were not proved.
[3] This court specifically declined to consider exceptions of res judicata and judicial estoppel, which had been overruled earlier by the trial court.
[4] Between the 1957 trespass and the 1974 trial, a national real estate developer had purchased considerable acreage in eastern New Orleans, including tracts on all sides of Grove 57. The surrounding acreage was developed into Lake Forest Estates No. 1 and No. 2, the latter including lakefront lots which sold from $25,000.00 to $38,000.00 depending upon size and location. The subdivisions contained paved streets, utilities and country club facilities. The highest priced of the fully developed lots sold for $1.88 per square foot, or about $350.00 per front foot.
[5] In the present case, where the dredging on Grove 57 took place over a number of weeks, there was a continuing tort until the dredging was concluded.
[6] In this respect we distinguish those cases in which the defendant's trespass continues because the offending object (such as a building) remains on the premises. See Prosser, Law of Torts, Ch. 3, § 13, p. 74 (4th ed. 1971). The present case involves permanent injury to the land as a consequence of a tort which was completed in 1957.
[7] This is the very basis upon which this court reversed the judgment maintaining the exception of prescription in the prior appeal in the present suit.
[8] This pleading thus violated C.C.P. art. 425's prohibition of an obligee's dividing an obligation for the purpose of bringing separate actions on different portions of the obligation. The public policy purpose of the article (and of the doctrines of res judicata and estoppel by judgment) is to avoid a multiplicity of suits and to prevent harassment, delay and undue expense caused by multiple suits.
[9] The court's recognition of plaintiffs' right to later claim recovery of this item effectively permitted an improper division of an obligation.
[10] In the prayer of their petition plaintiffs not only reserved the right to claim future damages for a continuing trespass (a claim which had no legal basis), but also reserved the right to seek indemnification of the cost of restoration (a claim which did have a legal basis and should have been asserted and determined in the prior suit).

Because of this court's discussion of both reservations in the opinion, we broadly construe the reservation in the decree to apply to both reservations in the petition, although we believe the proper procedure would have been to avoid piecemeal litigation and to decide the entire case or remand the entire case.
[11] C.C. art. 508 provides:

"When plantations, constructions and works have been made by a third person, and with such person's own materials, the owner of the soil has a right to keep them or to compel this person to take away or demolish the same.
"If the owner requires the demolition of such works, they shall be demolished at the expense of the person who erected them, without any compensation; such person may even be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.
"If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship, without any regard to the greater or less value which the soil may have acquired thereby.
"Nevertheless, if the plantations, edifices or works have been made by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed bona fide, the owner shall not have a right to demand the demolition of the works, plantations or edifices, but he shall have his choice either to reimburse the value of the materials and the price of workmanship, or to reimburse a sum equal to the enhanced value of the soil."
[12] We specifically do not intend to limit damages caused by trespass to the value of the property. The method of reparation used in this case will not achieve justice in all cases of tort-caused damage to land, and the total cost of restoration will sometimes be the proper method of reparation. However, the 1957 cost of restoration (which expert testimony established at almost $200,000.00) is totally unrealistic in this case. It is absolutely inconceivable that plaintiffs, if they had been awarded the cost of restoration at the time of the tort in this case, would have used an award in that amount to restore the property. This consideration alone suggests that the cost of restoration is not the proper method of restoring the tort victim to the position he enjoyed before the trespass.

If the property could have been restored for $36,000.00 (as asserted by T. L. James' unacceptable evidence in the first trial), there would be a much stronger argument for cost of restoration as the proper method of reparation, even though that cost exceeded the value of the property. If plaintiffs lived on the property, our decision might be different. But our decision as to method of reparation is based on consideration of all existing facts.
[13] For an intentional trespass plaintiffs would also be entitled to an award for mental anguish, which is considered as compensatory damages in intentional trespass cases. Fassitt v. United T. V. Rental, Inc., 297 So.2d 283 (La.App. 4th Cir. 1974); Loeblich v. Garnier, 113 So.2d 95 (La.App.1959); Grandeson v. International Harvester Credit Corp., 223 La. 504, 66 So.2d 317 (1953). In this case, however, the court in the original proceeding found the trespass was unintentional, and we decline to readjudicate that issue.
[14] We note that a similar enhancement in value probably has occurred in other property in the area which could have been bought to replace this virtually destroyed property.
[15] We have doubts as to the validity of the appraisal which established this value, because market value is affected by events such as the beginning of the construction of an interstate highway in the area, and the appraisal did not reflect this anticipated increase in market value on the investment property. However, this was the only appraisal which was presented at the original hearing, and the trial court accepted this appraised value as the value of the property. We accordingly decline to reinquire into the value of the property in 1957.
[16] We also note that in the earlier decision of this court on the exception of prescription, we held that prescription was interrupted by the original demand. This consideration strengthens our conclusion that the proper method of reparation is by the reference to the 1957 value rather than the 1974 value of the property.
[1] See Esnard v. Cangelosi, 200 La. 703, 8 So.2d 673 (1942); Barker v. Houssiere-Latreille Oil Co., 160 La. 52, 106 So. 672 (1925).