668 So.2d 1292 (1996)
Stanley J. STEWART
v.
PARISH OF JEFFERSON, Jefferson Parish Public Works.
No. 95-CA-407.
Court of Appeal of Louisiana, Fifth Circuit.
January 30, 1996.
Writ Denied April 8, 1996.
*1293 Gertler, Gertler & Vincent, M.H. Gertler, James F. Scott, New Orleans, for appellant Stanley J. Stewart.
Clement P. Donelon, Metairie, for appellees Parish of Jefferson, Harold Pete and Harold Schomaker.
Before KLIEBERT, GAUDIN and CANNELLA, JJ.
CANNELLA, Judge.
This appeal arises from a petition for damages filed on behalf of Stanley J. Stewart (Stewart), plaintiff/appellant, against the Parish of Jefferson, Jefferson Parish Department of Public Works (the Parish), Harold Pete (Pete) and Harold "Hap" Schomaker (Schomaker), defendants/appellees, for the intentional infliction of emotional distress. The trial judge dismissed Stewart's claims and he now appeals. We affirm.
Stewart began working as a classified employee for the Parish on August 18, 1970 and was terminated on August 27, 1989. On December 15, 1989, he filed suit in federal court alleging a violation of his constitutional rights. The U.S. District Court judge dismissed his federal claims on January 8, 1991 and declined to retain jurisdiction over his state claims. Stewart then filed suit in the 24th Judicial District Court on January 7, 1992. He also filed separate Civil Service appeals contesting his demotion, termination and alleging harassment. The Jefferson Parish Personnel Board dismissed his appeal. Stewart did not appeal from that dismissal.
We note at the outset that appellees have not filed an appeal nor answered the appeal. Nevertheless, they argue in brief that exceptions of prescription and lack of subject matter jurisdiction should be maintained. We conclude that these matters are not properly before us. Before trial the trial judge overruled the exceptions of lack of subject matter jurisdiction and prescription. Appellees applied for supervisory writs and in Stewart v. Parish of Jefferson, et. al., 94-942 (La.App. 5th Cir. 11/16/94) this court denied writs, stating:
... On the showing made we cannot say that the trial judge erred in his rulings, federal proceedings notwithstanding.
At the close of Stewart's case appellees reurged the exception of prescription which was again overruled by the trial judge. The exception of lack of subject matter jurisdiction was also reurged during trial. The trial judge subsequently rendered judgment on the merits which was silent as to the exceptions. In brief, appellees argue that Stewart's claims are prescribed as to Pete. In Bledsoe v. Willowdale Country Club, 94-234 (La.App. 5th Cir. 9/27/94); 643 So.2d 1302, 1304 we explained:
In DiCarlo v. Laundry & Dry Cleaning Service, 178 La. 676, 152 So. 327 (La.1933), the Louisiana Supreme Court held at 329 that a judgment "silent as to the plea of prescription presented to the lower court [m]ust be considered overruled." See also American Bank & Trust Co. v. French, 226 So.2d 580 (La.App. 1st Cir.1969).
Thus, the trial judge twice overruled these exceptions. Since no appeal was taken from the adverse rulings, neither exception is before us now. Matthews v. Farley Industries, 95-49 (La.App. 3rd Cir. 5/3/95); 657 So.2d 191.[1]
*1294 Stewart now appeals the dismissal of his claims by the trial court, specifying the following errors:
1. The trial court erred in failing to find that Stewart's previously diagnosed anxiety condition established that he was not an individual of ordinary sensibilities, but rather was exceptionally susceptible to emotional distress, and thus failed to apply the proper White v. Monsanto Co., 585 So.2d 1205 (La.1991) standard to Pete and Schomaker's actions.
2. The trial court erred in not taking into consideration Schomaker and Pete's knowledge of Stewart's emotional instability in determining whether the defendants committed the tort of intentional infliction of emotional distress.
3. The trial court erred in failing to find that Schomaker and Pete's actions after January 22, 1988 were outrageous in light of their knowledge of Stewart's anxiety condition.
4. The trial court committed legal error by requiring plaintiff to prove that defendants intended to cause Stewart a nervous breakdown, rather than severe emotional distress of any kind.
Stewart alleged that his supervisors, Pete and Schomaker, engaged in a "campaign" of harassment beginning in November or December of 1987 and ending with his demotion and subsequent termination on August 27, 1989. Joyce Breaud (Breaud), Stewart's longtime co-worker, ended a relationship with Pete, their immediate supervisor, in November or December 1987. The alleged harassment consisted of Pete's questioning Stewart about Breaud's outside activities, Pete's raising his voice while questioning Stewart, the effort of the supervisors' to increase Stewart's workload and the subsequent pressure placed on Stewart to take a demotion which led to his termination. Stewart contends that these actions by his supervisors caused him to develop a generalized anxiety disorder. Stewart views the alleged system of harassment as Pete's attempt at retaliation based on Stewart's status as Breaud's friend and co-worker.
The trial judge concluded that Stewart's sole remedy was worker's compensation benefits since he did not meet his burden of proving the tort of intentional infliction of emotional distress. The trial judge properly applied the test enunciated in White v. Monsanto Co., 585 So.2d 1205 (La.1991). White sets forth the test for proving intentional infliction of emotional distress, an exception to La.R.S. 23:1032 which provides that worker's compensation is an employee's exclusive remedy for a work-related injury. The White court held at 1208:
When an employee seeks to recover from his employer for an intentional tort, a court must apply the legal precepts of general tort law related to the particular intentional tort alleged in order to determine whether he has proved his cause of action and damages recoverable thereunder [citation omitted].
Plaintiff has the burden of proving:
(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.
White, supra, at 1209.
The record reveals ample evidence to support the trial judge's conclusions. Thus, we find no manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Our examination of the record reveals that Stewart was exposed to two separate stressful events involving different parties. The two incidents occurred on January 22, 1988, when Stewart became upset because Pete questioned him, and in December of 1988, when Schomaker informed Stewart that he was assigned to a special inspection team. These two events, and the record as a whole, do not prove a pattern of harassment by Pete and Schomaker.

JANUARY 22, 1988
Stewart testified that he began working for the Parish in 1970, starting as a laborer *1295 and ultimately became an Engineering Inspector II. Breaud started working with him in 1978. She had a relationship with Pete, but ended it in November of 1987. Pete began questioning Stewart about Breaud's after-work activities and whether Breaud was seeing anyone. Although Stewart told Pete that he did not know, Pete persisted.
On January 22, 1988, Pete called Stewart into his office for questioning. Although both Pete and Stewart disagree as to the exact content of the conversation, both agree that Pete only raised his voice and did not curse. Pete further testified that talking loudly is often done in this business.
Stewart testified that this incident made him so nervous that he had to be driven to the emergency room by Breaud. He was subsequently treated for an adjustment reaction to the January incident by Dr. Richard John Wakeman, a clinical psychologist.
Dr. Wakeman testified that he first saw Stewart on February 1, 1988. He said that Stewart had no history of prior psychiatric problems or treatment. Stewart underwent a six-week stress management program. According to Dr. Wakeman, Stewart's anxiety largely resolved after these sessions. He felt that Stewart had cleared his problems from the January 22, 1988 trauma. Over a year went by before Dr. Wakeman saw Stewart again.
Pete testified that before this incident he had never known Stewart to go to the hospital for treatment of an emotional condition. Breaud testified that occasionally Stewart argued with Pete. However, although Stewart was upset at those times, she knew of no time he was unable to work because he was upset.
The conduct of speaking loudly and questioning Stewart on January 22, 1988 was not extreme and outrageous. Speaking loudly in this work setting was not an unusual occurrence. The type of questioning also did not rise to the level of extreme or outrageous conduct. At the time of this incident Pete had no knowledge of any susceptibility on Stewart's part toward an anxiety reaction requiring treatment.
Dr. Brian Murphy, a psychologist, and Dr. Rennie W. Culver, a psychiatrist, both testified that Stewart was more sensitive than other individuals. Although Stewart may have been susceptible to an anxiety reaction, Pete had no knowledge of any such susceptibility. Further, there was no showing that Pete desired to inflict severe emotional distress or that he knew it was substantially certain to follow. White, supra.
Stewart testified that he and Breaud complained about Pete's questioning to Schomaker, Pete's supervisor. Schomaker met with them twice. Although Stewart stated that these meetings did not solve the problem of continued questioning by Pete the record establishes that it was solved when Pete was ultimately removed as their supervisor on March 25, 1988.
On cross examination Stewart was asked to explain how Schomaker retaliated against him. He stated that he had two meetings with Schomaker where nothing was done, also that when Breaud was transferred he had to do more work. However, there is no evidence that Stewart complained to Schomaker about Breaud's transfer. Additionally, Stewart's new supervisor, Lawrence Nulty, testified that Stewart's work schedule did not change after the transfer. That department normally had a backlog. He never asked Stewart to do more work in a day then he had done prior to Breaud's transfer. Stewart testified that he worked during his lunch hour but that no one told him to do so.
There is no evidence that Schomaker intentionally inflicted emotional distress on Stewart. To the contrary, the evidence reveals that he timely participated in meetings with Stewart and resolved the conflict by agreeing to change Stewart's supervisor and did nothing to impede the change. He also spoke to Pete and asked him to stop questioning Stewart.

DECEMBER 1988
B.K. Snead, Schomaker's supervisor and current Director of Public Works, testified that he created an independent inspection team in late 1988. The team was to inspect drain lines and to start a planned maintenance program. Snead wanted this *1296 team to verify that repairs were done as claimed. The Parish currently has a planned maintenance program in place. The team served continuously for a while then began functioning as troubleshooters. It was not unusual for the Parish to form a special task force to study problems. The duties of the team members were the same that they were expected to perform as part of their normal duties as engineering inspectors.
Snead selected Charles Julian (Julian) for the team. Julian was assigned the task of picking the other members of the team. Jules Simoneaux (Simoneaux), Yani Livingston and Stewart were the first chosen. Stewart was chosen because his duties could be more easily picked up by others. Snead informed Schomaker about the team.
Schomaker testified that he met with Stewart in December 1988 to inform him of his new assignment. Schomaker told Stewart to report to Simoneaux who would brief him on his duties. Stewart thanked him at this time and said "fine."
In the beginning of January 1989 both Stewart and Simoneaux told Schomaker that Stewart would not perform his duties. Stewart testified that he was not told until December 1988 that he would have to go into manholes and drain pipes as part of his duties. He has a fear of being caught in a pipe as well as a fear of snakes and rats. He told Schomaker that he would do any other work on that project. Schomaker told him if he did not get into the manholes he would be demoted or fired. It upset him to lose his job and he was willing to try anything. He agreed to the demotion and transfer for fear of losing his job.
Stewart was then transferred to another department. He swapped jobs with Carlos Jones who worked as a sign technician in the Department of Traffic and Engineering. Stewart testified that his job as inspector was to inspect work orders. He was terminated in August of 1989.
Dr. Wakeman testified that he saw Stewart on June 26, 1989, after he was demoted. At that time he was considerably more anxious than he had been at the conclusion of the outpatient sessions in April of 1988. Dr. Wakeman felt that Stewart needed to be hospitalized. He recommended Stewart terminate his job. All three experts who testified agreed that Stewart eventually suffered from Generalized Anxiety Disorder. Dr. Wakeman testified that after the initial trauma of January 1988, Stewart improved. He viewed the demotion as a major trauma causing him to develop Generalized Anxiety Disorder.
The trial judge heard conflicting testimony as to the duties of an engineering inspector, such as Stewart. Breaux and Stewart testified that they never went into manholes to perform inspections. However, Breaud did admit that Simoneaux and other inspectors went into the drains. Simoneaux, Nulty, Snead, Schomaker, Jones, and Earl Persick (Persick), a former inspector, all testified that going into drains was part of the job of an inspector. Nulty, Stewart's supervisor at the time, testified that he assumed inspectors were doing this, since it was part of their job.
Persick explained that he did not know how an inspector could do the job without going into manholes. None of the mechanical devices used eliminates the need to go into manholes and to physically look in the lines.
The trial judge evidently believed the testimony that Stewart was only asked to perform his normal job duties in December of 1988. The trial judge's conclusion based on a credibility determination was reasonable. Davis v. United General Ins. Co., 95-0608 (La. 5/5/95), 654 So.2d 317.
Philip M. Rupp (Rupp), Human Resource Administrator, testified that refusal to perform job duties is called insubordination and is "one of the most serious infractions at a jobsite." However, Schomaker did not want to terminate Stewart but instead wanted to transfer him.
Schomaker stated he contacted the Director of the Engineering Department and asked if he could use Stewart. There were no vacancies. However, the director agreed to swap another employee for Stewart. In January 1989 Schomaker met with Rupp and Stewart to inform Stewart of the transfer. Stewart agreed. Rupp stated that Stewart *1297 thanked them for making this arrangement. Schomaker had no further contact with Stewart after the transfer.
Schomaker also denied having any conversations with Pete regarding retaliating against Stewart. He denied socializing with Pete outside of work.
Although Stewart claims that there was a continued pattern of harassment, he improved, nevertheless, to such an extent, after the outpatient sessions, that he did not return to Dr. Wakeman for one year and three months. Dr. Wakeman felt that Stewart had resolved his earlier problem. Thus, there is no indication from his treating psychologist of continued problems with stress necessitating treatment during that interim period.
Furthermore, the trial judge evidently concluded there was no intentional infliction of emotional distress in December of 1988 and that instead, Stewart was only being asked to perform his normal duties. Although Stewart testified that he was never asked to go in to manholes before, there was ample evidence that the duties of an Engineering Inspector II make this necessary at times. We find no manifest error by the trial judge.
Accordingly, for the reasons stated, the judgment is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] Appellant argues in brief that our prior ruling has become the "Law of the Case." However, this court has the discretion to reconsider its rulings on a writ application if the ruling is palpably incorrect or would work a manifest injustice. Vincent v. Dodge, 94-291 (La.App. 5th Cir. 3/01/95); 652 So.2d 84, writ denied, 95-1247 (La. 6/30/95); 657 So.2d 1034.